Victor Manuel MARTINEZ,
Petitioner-Appellee,

v.

Louie L. WAINWRIGHT, etc.,
Respondent-Appellant.

No. 79–2605.

United States Court of Appeals,
Fifth Circuit.

July 10, 1980.

Rehearing Denied Aug. 21, 1980.

Paul Mendelson, Asst. Atty. Gen., Miami, Fla., for respondent-appellant.

Thomas Almon, Jr., Miami, Fla., for petitioner-appellee.

Before JONES, GEE and REAVLEY, Circuit Judges.

REAVLEY, Circuit Judge:

Victor Martinez was convicted by a Florida jury of second degree murder and sentenced by the court to life imprisonment in the state penitentiary. His conviction and sentence was affirmed by the Florida appellate courts, *Martinez v. State*, 346 So.2d 1209 (Fla. 3rd Dist.Ct.App.1977), *cert. denied*, 354 So.2d 983 (Fla.1978).

Martinez filed a petition for a writ of habeas corpus in the United States District Court complaining of the state's failure to furnish a copy of the deceased's "rap sheet" pursuant to a specific request, violating Martinez' due process rights as explained in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The federal district court conditionally granted the writ unless the state granted Martinez a new trial. We affirm.

### Facts

The homicide which gave rise to this prosecution was the culmination of incidents which had begun about a week earlier. Martinez had lived with his common law wife for a number of years, and they had one child. After a marital dispute, Martinez and his wife separated, and she went to Puerto Rico for a few days where she met Angel Millan, the eventual homicide victim, and Pedro Pena, his bodyguard. Millan apparently followed Mrs. Martinez back to the United States. On the day of the homicide, Millan and Pena went to her apartment and that evening met Martinez, who knew nothing of either man or their relationship with his wife.

There were two witnesses to the events preceding Millan's death: Martinez and Pena. Martinez testified that he acted in self-defense: Millan told him of his intention to move in with Mrs. Martinez, boasted that he had been convicted of homicide and selling cocaine and marijuana, and then drew a gun and shot Martinez. Martinez retrieved his own gun and shot Millan, then scuffled with Pena with additional shots being fired by both of them.

Pena did not corroborate Martinez' testimony that Millan had boasted of his criminal record. Pena testified that Millan and Martinez calmly discussed Mrs. Martinez, apparently settled the matter, and sat down to friendly drinks. Suddenly Martinez called Millan to the bathroom and shot him, then fought Pena and rendered him unconscious.

Petitioner specifically requested the deceased's rap sheet in advance of trial [1] and again during the trial. The prosecuting attorney emphatically denied any knowledge of a rap sheet on Millan during the trial and assured the court that he had pursued all known avenues of obtaining one.[2] Again, at the sentencing hearing,

1. During a pretrial discussion with the prosecutor and trial judge, defense counsel stated as follows:

   MR. MASSEY: . . . I just want the state to produce to me, which I think I am entitled to, that which they haven't given to me. Now, I went through the proper procedure. I subpoenaed the police officer; I subpoenaed the records; they said they don't have it. My information on this case is that the deceased is a convicted murderer, a seller and possessor of drugs . . . and I'm asking for the rap sheet of the deceased because I think it's necessary to reiterate my position of self-defense, because the character of the deceased is an important element in this case.
   State Trial Transcript 3–6.

2. MR. LAESER [State Prosecutor]: Your Honor, I am not aware. *Counsel—defense counsel—asked me repeatedly.* I've checked with the police officer. The only thing I have any information about is that one of the victim's relatives said they heard, up in New Jersey, he was involved in some drugs. They don't know the outcome of the case. They don't know anything else about it—no member of the family. No police record indicates he has ever been involved in a violent crime, that the State is aware of in any way, shape, or form. I don't know how he was involved in drugs in New Jersey; whether it was possession, sale; whether he was convicted.

   \* \* \* \* \* \*

   MR. LAESER: If there was a rap sheet, I would have one. I have asked the officers. They have indicated to me that there is no rap sheet.

   \* \* \* \* \* \*

   THE COURT: The method is to go through the FBI for it.
   MR. LAESER: I have exhausted all known means, at the present time, of obtaining the rap sheet for the deceased. To my knowl-

petitioner specifically requested Millan's rap sheet, but the court was assured by the prosecutor that if any such records existed, the prosecutor would have received it and turned it over to the defense.[3] It is undisputed that Millan did, in fact, have an extensive criminal record and the rap sheet, provided by the FBI, resided in the medical examiner's office throughout the trial. That FBI record shows a homicide charge in New York and three drug related convictions in New York, New Jersey and Pennsylvania.

### The Requirements of Brady

In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court determined that prosecutorial failure to reply to a specific defense request for information in its possession but unobtainable by the defense constituted a denial of due process. This court has enunciated three requirements that the defense must meet to establish a successful claim: "(1) the prosecutor's suppression of the evidence, (2) the favorable character of the suppressed evidence for the defense, and (3)

the materiality of the suppressed evidence." *United States v. Preston*, 608 F.2d 626, 637 (5th Cir. 1979), *quoting United States v. Delk*, 586 F.2d 513, 518 (5th Cir. 1978). Martinez has met all three factors.

### A. *Suppression by the Prosecutor*

The prosecutor contends that because he was not in possession of the rap sheet and was unaware of its existence, he cannot be held responsible for suppressing evidence under *Brady*. This argument is unpersuasive in view of his assurance to counsel and to the court that he had exhausted all avenues of inquiry and that no rap sheet or record of conviction existed. The duty to produce requested evidence falls on the state; there is no suggestion in *Brady* that different "arms" of the government are severable entities. *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973). In *Deutsch* the court held that the United States Attorney's failure to produce the personnel file of a key witness that was not in his possession, but in the possession of the Post Office Department for whom the witness worked, constituted error and remanded to the trial court for a determination of the materiality of the file. Similar-

---

edge, none have been returned; the officers are unaware of any. None has been returned to the State Attorney's Office. Nobody has orally communicated that one was on the way, or lost, or anything. I just don't have any information on the victim in this case, Angel Millan, ever being convicted of any crime, whatsoever.
State Trial Transcript 71–73.

3. MR. MASSEY: Well, you see, the thing is in the hands of the State. We can't get the FBI record. There is no way for us to get it. I subpoenaed the medical examiner's office to bring it to me, but I couldn't get it.
MR. LAESER: The doctor has no records to the effect with reference to any such past of the victim. We have talked to those involved, but whether the victim has a conviction past at that time or at this time, would have no bearing now.

If counsel thinks he has information from a source, fine, but there is no criminal record to show, in fact, Angel Millan was ever convicted of any crime aside from the fact he was arrested in New Jersey for some charge which is the only information I was given and that has been given to the Court at an earlier time.

\* \* \* \* \* \*

MR. MASSEY: Could the Court order the medical examiner to bring the FBI record of the deceased? I subpoenaed it and I definitely stated for him to bring it. It would help the Court in the judgment of sentence.

\* \* \* \* \* \*

MR. LAESER: The reason the doctor didn't bring it was because he didn't have any record of the deceased. He didn't have any fingerprint record. He didn't have any prior conviction record.

\* \* \* \* \* \*

MR. LAESER: Judge, I would have received this during the normal course of this proceeding, one of my police officers would have turned that matter in to me if it existed, but it doesn't exist. I think, the facts are what the deceased did and only that could go to the question of sentencing. I have no objection to giving it to counsel if I knew any such record existed. There is just no police agency that made me aware of that fact.
Transcript of Sentencing Hearing in State Court 2–6.

ly, Florida has determined that a defendant is "properly allowed discovery as to the criminal records of the State's witnesses to the extent that the information is in the actual or constructive possession of the State, not limited to that in the physical possession of the State Attorney's office, and including data obtainable from the FBI." *Yanetta v. State*, 320 So.2d 23, 24 (Fla. 3rd Dist.Ct.App.1975), *citing State v. Coney*, 294 So.2d 82 (Fla.1973).

In the case at bar, the rap sheet was in the possession of the medical examiner's office.[4] The assistant medical examiner testified for the prosecution at trial on the cause of death. Moreover, it was standard practice for the medical examiner's office to submit fingerprint records of all bodies to the FBI and receive the FBI rap sheet as a verification of identification. The entire process takes, at most, five weeks, and it is undisputed that the rap sheet was in the medical examiner's office throughout the trial.

The prosecutor never alleged any difficulty in gaining access to the rap sheet held by the medical examiner's office, which, we must note, is in marked contrast to Martinez' unsuccessful subpoena, *see* footnote 3, *supra*, but denied not only present possession, but retention of any such record by the medical examiner's office. The rule of *Brady* would be thwarted if a prosecutor were free to ignore specific requests for material information obtainable by the prosecutor from a related governmental entity, though unobtainable by the defense.

"The duty to disclose is that of the state, which ordinarily acts through the prosecuting attorney . . .." *Barbee v. Warden, Maryland Penitentiary*, 331 F.2d 842, 846 (4th Cir. 1964).

It is undisputed, furthermore, that the FBI possessed a rap sheet on the deceased. The federal district court found that FBI arrest records are not provided to private individuals but only to police and other investigatory agencies. *Martinez v. Wainwright*, No. 78-830 (S.D.Fla., filed May 4, 1979), at n. 10. At oral argument before this court, the assertion of Martinez' counsel that the normal method of obtaining the FBI rap sheet was through the state prosecutor's office was undisputed. Indeed, even the state trial judge commented to the prosecuting attorney during the course of the trial that a rap sheet, if in existence, would be obtainable from the FBI.[5] Nonetheless, the prosecutor assured the court that all known sources for obtaining a rap sheet had been exhausted and that he would have received a rap sheet in the normal course of the investigation. That the prosecutor was personally unaware of the existence of the rap sheet does not excuse his misrepresentation to the trial court that a rap sheet was unavailable. *See United States v. James*, 495 F.2d 434, 435–36 (5th Cir.), *cert. denied*, 419 U.S. 899, 95 S.Ct. 181, 42 L.Ed.2d 144 (1974). While the prosecutor's actions can be characterized as only negligent "[t]he deception which results from negligent non-disclosure is no less damaging than that

**4.** The government cites *State v. Tsavaris*, 382 So.2d 56 (Fla. 2d D.Ct.App.1980), *cert. filed* (April 18, 1980), for the proposition that a Florida medical examiner is not a law enforcement officer. The *Tsavaris* court simply held that as of 1975, before the enactment of Fla.Stat. § 936.003(1) (1980) which vests the duties of a coroner in the medical examiner, a medical examiner would not be considered a law enforcement officer for purposes of the state wiretap act. *Id.* at 61. This argument fails to explain why the medical examiner's office is not a state investigative agency such that information in its possession is attributable to the state. Fla.Stat. § 406.11(1) (1980), provides as follows:

In any of the following circumstances involving the death of a human being, the medical examiner of the district in which the death occurred or the body was found shall determine the cause of death and shall make or have performed such examinations, investigations, and autopsies as he shall deem necessary or as shall be requested by the state attorney:

(a) when any person dies in the state:
(i) Of criminal violence

"The duty of disclosure affects not only the prosecutor, but the Government as a whole, including its investigative agencies." *United States v. Bryant*, 439 F.2d 642, 650 (D.C. Cir. 1971) (requiring production of evidence held by the Bureau of Narcotics and Dangerous Drugs).

**5.** See note 2, *supra*.

deception which is a product of guile, and such negligent nondisclosure entitles a defendant to relief." *Shuler v. Wainwright*, 341 F.Supp. 1061, 1069 (M.D.Fla.1972), *remanded on other grounds*, 491 F.2d 1213 (5th Cir. 1974), *accord, Grant v. Alldredge*, 498 F.2d 376, 382 (2nd Cir. 1974), *United States v. Valdivia*, 492 F.2d 199, 205–06 (9th Cir.), *cert. denied*, 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974).

■ Our conclusion that the prosecutor may be deemed to have been in possession of the rap sheet, by virtue of its retention by the medical examiner while the prosecutor assured all that no such document existed, effectuates the purpose of *Brady* and *Agurs.* A contrary holding would enable the prosecutor "to avoid disclosure of evidence by the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial," *United States v. Trevino*, 556 F.2d 1265, 1272 (5th Cir. 1977).

### B. *Material, Favorable Evidence*

The materiality of the rap sheet as well as its support of the defense is apparent. Defendant and the deceased were total strangers. Defendant testified at trial that shortly before the shooting began, the deceased bragged that he had been convicted of murder and drug dealing. The evident purpose was to convince the defendant that the deceased was the type of person against whom resistance would prove not only futile, but ill-advised. Because defendant and the deceased were strangers, there was no way defendant could have known of the deceased's prior conflicts with the law unless the deceased had told him. The deceased's rap sheet reveals that he had been indicted, and in most cases, convicted, of the crimes about which he boasted.

**6.** Under Florida law, when the defense of self-defense to a charge of homicide is involved, the trial court may admit any facts which reasonably could be said to have affected the defendant's apprehension, at the time of the slaying, of death or great bodily harm, including specif-

■■ The state contends that the rap sheet would not have been admissible under Florida law to prove the specific acts of violence listed on it because the defendant had no knowledge of the deceased's bad acts prior to the fatal confrontation.[6] This argument ignores defendant's testimony in which he stated that deceased had informed him of his criminal past before the shooting. If defendant was aware of the deceased's criminal record, specific acts of misconduct by the deceased would have been admissible. *Rolle v. State*, 314 So.2d 167 (Fla. 3rd Dist.Ct.App.1975). If the rap sheet were held to be hearsay and not admissible to prove the prior convictions, it at least would have provided the defense the ability to contact the appropriate penal facilities to acquire an official record which would have been admissible. Fla.Stat. § 90.955 (1979); *State v. Crawford*, 257 So.2d 898, 900–01 (Fla.1972). Without the rap sheet, however, it was virtually impossible for the defendant to learn where the deceased had been incarcerated and to obtain the appropriate records.

■ The information recorded on the rap sheet was highly favorable to the accused, as it tended to prove that the deceased had spoken as defendant testified. The rap sheet, by virtue of the fact that all of the incidents the defendant attested to are confirmed there, supports his testimony that the deceased had made such statements—that the defendant had not fabricated the conversation. "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule" (that suppression of material evidence justifies a new trial). *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). The information on the rap sheet, which serves to corroborate, to some extent, Martinez' testimony and refute Pena's, may well have proved critical to the jury.

ic acts of violence by the deceased known to the defendant at the time of the slaying. *Palm v. State*, 135 Fla. 258, 184 So. 881 (1938); *Williams v. State*, 252 So.2d 243 (Fla. 4th Dist.Ct. App.), *cert. denied*, 255 So.2d 682 (Fla.1971). See Fla.Stat. § 90.405(2) (1979).

We therefore hold the information contained in the rap sheet to be evidence both material and favorable to the defense, and find that its suppression by the prosecution denied Martinez a fair trial.

AFFIRMED.