**UNITED STATES of America, Appellee,**

v.

**Carlos A. SAMALOT PEREZ and Enrique Ramos Rosa, Defendants, Appellants.**

No. 84–1321.

United States Court of Appeals,
First Circuit.

Submitted March 8, 1985.

July 2, 1985.

Bailey Aldrich, Senior Circuit Judge, concurred and filed opinion.

Luis F. Abreu Elias, Hato Rey, P.R., on brief, for defendants, appellants.

Mervyn Hamburg, Washington, D.C., and Daniel F. Lopez-Romo, U.S. Atty., Hato Rey, P.R., on brief, for appellee.

Before TORRUELLA and ALDRICH, Circuit Judges, and SELYA,* District Judge.

TORRUELLA, Circuit Judge.

Following their joint jury trial, Carlos A. Samalot Pérez and Enrique Ramos Rosa were convicted of robbery and conspiracy to commit robbery in violation of the Hobbs Act, 18 U.S.C. § 1951. Each defendant received two consecutive twelve-year sentences. They now appeal their convictions and the sentences imposed.

Evidence presented at trial tended to show the following sequence of events. Early in November of 1979, Freddy Narvaez, a police officer assigned to the Criminal Investigation Corps, asked Justino Ríos, a fellow officer, whether he was interested in joining a scheme to rob a diamond cutting company in Hato Rey, Puerto Rico. Ríos agreed and the two men made several visits to the processing factory for the Sidney Landau Diamond Cutting Corporation, a New York City corporation. They observed that Alfredo Rivera, the diamond factory supervisor, regularly transported the cut diamonds in his car from the factory to the Hato Rey Post Office for shipment to New York.

Later that month, five individuals had agreed to carry out the robbery: police officers Rios, Samalot, and Ramos, a subdirector of the Criminal Division of the Puerto Rican Police Department, Hiram Vázquez, and former police officer Jorge Derieux. Narvaez did not join with the final group and was not indicted in connection with the crime. On several occasions, members of the group tracked Rivera while he made his deliveries and they decided to confront him along the route between the factory and the post office. They planned to use one car to follow Rivera, one to ride in front of him, and a third with a police radio that Vázquez would monitor.

On November 20th the group convened near the diamond factory and stolen license plates were placed on the vehicles owned by appellants Samalot and Ramos. Vázquez then drove to a spot along the route to the post office to wait for Rivera's car to pass. Samalot drove to a second point along the route, a little further from the factory, planning to maneuver his car in front of Rivera's when it arrived. Ramos, Derieux, and Ríos, waited in a Buick by the factory.

Shortly after 4:00 PM, Rivera left the factory with a box of diamonds, entered his car, and headed toward the post office as expected. The Buick, with Ramos driving, followed Rivera's car. When they passed Vázquez' car, he also fell in line, following Ramos. When the three cars reached the location where Samalot was waiting, Samalot maneuvered his car in front of Rivera and all four cars traveled in this manner until Samalot, in the lead, reached a stop sign. The three cars behind him stopped in turn, leaving Rivera "sandwiched" between Samalot's and Ramos' cars.

---

* Of the District of Rhode Island, sitting by designation.

Derieux approached Rivera from the left side of the car, aiming a .357 magnum pistol at Rivera and warning him to cooperate. He then reached into the car and unlocked the passenger's door for Rios who waited on the right side of Rivera's car. Rios then entered the car and took the box of diamonds while Derieux removed the keys from Rivera's car. Ramos pulled the Buick up beside Rivera's car and picked up Rios and Derieux and they drove away with the diamonds, with an estimated value of $200,000.

After a few unsuccessful attempts by the group members to fence the diamonds, Ramos finally sold them and met with Samalot and Vázquez to divide the proceeds. Trial testimony indicated that Rios received $300, Derieux from $1,000 to $1,200, and Vázquez from $3,900 to $5,000.

■ Appellants' first claim of error relates to Rivera's in-court identification of Samalot. Apparently, the first time Rivera ever identified or gave a description of Samalot was at trial, over four years after the robbery had taken place. On the witness stand, Rivera described the man who drove the car in front of his own and then pointed to Samalot as the man fitting that description. Rivera testified that his memory of Samalot was based on his having viewed the defendant first as Samalot pulled out of the parking lot and later when Samalot occasionally glanced back at Rivera while they were driving.

Samalot's counsel objected to the admission of the identification as highly unreliable. He pointed out that no identification of Samalot was ever made during the four years and four months that preceded the trial, either by photo display or line up, and that Rivera had never given a description of the driver to the police.

■ The general rule regarding in-court identification of a defendant is that it is admissible when made under oath by someone who was present at the scene and observed the commission of the crime. *See Coleman v. Alabama*, 399 U.S. 1, 5–6, 90 S.Ct. 1999, 2001, 26 L.Ed.2d 387 (1970);

*United States v. Wade*, 388 U.S. 218, 240, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967); *Sanchell v. Parratt*, 530 F.2d 286, 292 (8th Cir.1976). Rivera's testimony meets these prerequisites. It is then for the factfinder to determine the weight the testimony should be given in light of the surrounding circumstances. *See Hoffa v. United States*, 385 U.S. 293, 311, 87 S.Ct. 408, 418, 17 L.Ed.2d 374 (1966). Here the trial judge instructed the jury to bear in mind the factors of time delays, Rivera's limited opportunity to observe Samalot, visibility problems, and the repercussions of misidentification. With these considerations in mind, the jury was free to assign whatever weight it deemed appropriate to Rivera's testimony. The court's decision to admit the identification, therefore, was appropriately within its discretion. We also note that the defendant's extensive authorities are cases where it had been claimed that the in-court identification had been tainted by prior suggestion.

Furthermore, the jury also heard testimony from three other government witnesses to support its finding that Samalot was the driver of the lead car. Both Derieux and Vázquez stated that Samalot drove the car, and Rios testified that it was either Ramos or Samalot. Consequently, even if it had been inappropriate for the court to allow Rivera's in-court identification, it was at most cumulative and harmless. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Kotteakos v. United States*, 328 U.S. 750, 763–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946); *United States v. Levine*, 569 F.2d 1175, 1177 (1st Cir.), *cert. denied*, 436 U.S. 928, 98 S.Ct. 2824, 56 L.Ed.2d 771 (1978).

Appellants next contend the evidence introduced at trial was insufficient to support their convictions. They cite inconsistencies in testimony and bias of the three government witnesses who were apparently given immunity from prosecution of certain charges in exchange for their willingness to testify.

**4**

In reviewing a conviction challenged on the basis of insufficiency of evidence, the court must determine whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *United States v. Patterson,* 644 F.2d 890 (1st Cir.1981). Having reviewed the record with this standard in mind, we find appellants' challenge without merit.

The jury heard extensive testimony from the robbery victim Rivera, and from three of the five participants in the crime who testified as government witnesses. All versions of the incident were sufficiently consistent with each other to convince the jury that Samalot and Ramos participated in the robbery in the manner charged. Moreover, appellants' statement that the testimony of the three accomplices was uncorroborated is clearly incorrect since Rivera's testimony served as nonaccomplice corroboration. Besides, even uncorroborated accomplice testimony is sufficient to sustain a conviction so long as it is not "incredible or otherwise insubstantial on its face." *United States v. Maguire,* 600 F.2d 330, 331 (1st Cir.), *cert. denied,* 444 U.S. 876, 100 S.Ct. 159, 62 L.Ed.2d 104 (1979).

Appellants' third claim of error relates to a discovery motion for photographic spreads shown to government witnesses. At the time of the motion, counsel for the government stated that all materials producible under Rule 16 of the Federal Rules of Criminal Procedure were available for inspection, and that there were no photograph arrays. At trial, however, a report introduced by the government indicated that Rivera, the robbery victim, had been shown six photographs but was unable to identify any of the alleged robbers among them. Appellants' counsel then requested a dismissal on the grounds of prosecutorial misconduct. The government's response was threefold. First, counsel stated that at the time he responded to the discovery request he was unaware that Rivera had been shown a photo array. Second, because the array did not contain pictures of the appellants, but only of Ríos who was not a defendant, the government had no intention of using it against them. Third, the government was willing to, and did, produce the photo array at that time. Considering these factors, the court denied appellants' motion to dismiss.

The lower court's handling of a matter of non-compliance with discovery orders is within its discretion, and will only be overturned for an abuse of that discretion. *United States v. Richman,* 600 F.2d 286, 292 (1st Cir.1979); *United States v. Gladney,* 563 F.2d 491 (1st Cir.1977). Here the court agreed with appellants that the photo spread should have been produced, but found no bad faith by the government nor material harm to the defendants to warrant a dismissal. We agree with the court's conclusion. Once the six photographs were produced, counsel for Samalot used them extensively during cross-examination of Rivera, seeking to cast doubt on Rivera's ability to identify the robbers in court, since he had been unable to identify Ríos in the photographs. Defendants' counsel apparently took full advantage of whatever value the photos may have had to developing the defense. *See United States v. Xheka,* 704 F.2d 974, 981 (7th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983).

Appellants' other claims with respect to discovery materials are similarly without merit. The defendants' right of access to material evidence favorable to the accused and held by the prosecution is closely tied with the accused's due process rights. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Martinez v. Wainwright,* 621 F.2d 184, 186 (5th Cir. 1980). On review of the record overall, we find that the government has acted conscientiously and properly within the law in handling appellants' discovery requests. *See United States v. Campagnuolo,* 592 F.2d 852 (5th Cir.1979); Jencks Act, 18

U.S.C. § 3500; Fed.R.Crim.P. 16. Appellants have been accorded their full due process rights.

■ Appellants next point out that the jurors had been exposed to a great deal of allegedly prejudicial pretrial publicity since the case potentially involved the exposure of police corruption. Without substantiating their claim with any specific instances of juror bias or of particular examples of media coverage, appellants make a general allegation that they had been "crucified in the press, radio, television; tried and publicly convicted." They contend that the judge made insufficient inquiry into each juror's pretrial familiarity with the case, and that he improperly denied the defense's request to pose specific questions or to allow defense counsel to conduct their own voir dire.

■ When pretrial publicity threatens to impede the selection of an unbiased jury, the trial judge must take extra care to ensure that the particular jurors selected do not come to the trial with preconceived notions about the defendant's guilt. *United States v. Hall,* 536 F.2d 313 (10th Cir.), *cert. denied,* 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976); *United States v. Liddy,* 509 F.2d 428 (D.C.Cir.1974), *cert. denied,* 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975). In furtherance of this purpose, the judge may also allow the defendant or his counsel to participate in the selection process by addressing questions to the jurors. Fed.R.Crim.P. 24(a).

On the morning that the jury was to be selected, counsel for Samalot requested that the court pose certain questions to the venire regarding the potential jurors' exposure to pretrial publicity. The next day counsel for Ramos stated for the record that he also joined in that request, retroactively in a sense, since jury selection had already been completed. Contrary to appellants' contention that their requests were "ignored by the court," the judge noted that he had considered the requests, even though they were submitted belatedly, and took them into consideration when questioning the prospective jurors. Transcript at 21–23.

■ Among the questions the judge asked the potential jurors were at least three that were specifically designed to discover bias caused by pretrial publicity. He asked jurors whether they had been exposed to "any type of material, written, oral, documental or otherwise, related to this case." Transcript at 20. He asked "Do you believe that what you have read or heard in the newspapers or media has prejudiced, predisposed or led you to form an opinion as to guilt or innocence, or will it affect the deliberating process in which you will be involved?" Transcript at 21. Finally, the jurors were asked "Do you believe that you can make up your mind as to the guilt or innocence of either of these defendants on each count based solely upon the evidence that you receive, irrespective of what you might have read or heard in the newspaper or media?" Transcript at 21. When a trial judge has conducted a voir dire examination with questions effectively designed to unveil any impartiality, then we will set aside his action "only where juror prejudice is manifest." *United States v. McNeil,* 728 F.2d 5, 9 (1st Cir.1984). We find that the appellants have demonstrated no such manifest prejudice here and that the judge's questions were well calculated to insure the selection of an impartial jury. *See Rosales-Lopez v. United States,* 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981); *Salemme v. Ristaino,* 587 F.2d 81 (1st Cir.1978).

■ Finally, appellants claim that their sentences of two consecutive twelve-year terms were excessive because they were first-time offenders. They state that defendants convicted in the federal court for the District of Puerto Rico receive sentences far harsher than those imposed in other districts. We note first that the statute under which appellants were convicted would allow far greater punishment than they received. 18 U.S.C. § 1951 ($10,000 fine or up to twenty years imprisonment, or both, for each count). The trial judge has broad discretion in making sentencing

**6**

decisions, *see, e.g., United States v. Gibson*, 726 F.2d 869 (1st Cir.1984), and we will not overturn that decision absent an abuse of discretion or extraordinary circumstances not present here. *See United States v. Reed*, 674 F.2d 128, 130 (1st Cir.1982). To this we add only the observation that if appellants feel that federal offenses committed in Puerto Rico receive unduly harsh sanctions, perhaps the appellants should not have chosen this location to commit their crimes.

*Affirmed.*

BAILEY ALDRICH, Senior Circuit Judge (concurring).

Because of our minimal appellate jurisdiction over sentencing, I do not dissent in this case, but I disassociate myself vigorously from the final sentence of the court's opinion. In the first place, it is not apposite. Defendants were local police officers, not professional thieves who could be thought to have come to Puerto Rico to commit crimes because of its supposed easy-going sentencing practices. But far more important, while there may be a superficial appeal in the thought, "go take your business elsewhere," it is entirely contrary to the concept of federalism. Sentencing is to reduce crime, not to transfer it to your neighbors. That federal judges, countrywide, should try to outbid each other in high sentencing is [not only] not a pretty picture. Moreover, it is contrary to all principles of criminal sentencing, whether addressed to the crime, or to the individual.

Disparate sentencing is one of our great problems. To quote just a smattering from the American Bar Association, *Standards of Criminal Justice*, Chapter III,

One of the "targets of recent critiscism" of sentencing is "the pervasiveness of sentencing disparities among the similarly situated." (P. 5)

"*[E]*quality among the similarly situated is basic to the appearance of justice, and compelling reasons should therefore exist before disparate treatment of the equally blameworthy is tolerated. (P. 8)

"Empirical evidence also suggests that sentencing disparities are among the leading perceived grievances of prisoners and succeed in deepening their alienation from society." (P. 224).

I hope no future district court judge will think this decision speaks for the court as a whole.