782 So.2d 373 (2001)
Jerry Layne ROGERS, Appellant,
v.
STATE of Florida, Appellee.
No. SC91044.
Supreme Court of Florida.
February 15, 2001.
Rehearing Denied March 27, 2001.
*374 John G. Buchanan, III, Timothy C. Hester, Benedict M. Lenhart, Michael S. Labson and Andrew J. Heimert of Covington & Burling, Washington, DC; and Jerrel Phillips, Tallahassee, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Mark S. Dunn, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
Jerry Layne Rogers appeals an order entered by the trial court below denying his motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Because the State withheld material evidence implicating an alternate suspect and impeachment evidence concerning the State's chief witness, we reverse the trial court's ruling and order a new trial.

PROCEEDINGS TO DATE
On November 13, 1984, Rogers was convicted for the first-degree murder of David Eugene Smith. The facts of this case are set forth in greater detail in Rogers v. State, 511 So.2d 526 (Fla.1987). The State's case at trial was substantially predicated upon the testimony of Thomas McDermid, a codefendant and the State's chief witness, who entered into a favorable plea bargain with the State.[1] McDermid testified that Rogers rented a car in Orlando. Although Rogers admitted to personally renting the car, he contended at trial that he merely rented the car for McDermid. Rogers, his wife, and another family member testified that on the night of the murder, Rogers attended a cookout with family members and a couple named John and Laura Norwood. The Norwoods allegedly disappeared by the time of trial and did not testify. According to McDermid, after picking up two .45 caliber semiautomatic handguns, Rogers and McDermid decided to rob a Winn-Dixie grocery store. The pair pulled into an adjoining motel parking lot, donned rubber gloves and nylon stocking masks, and proceeded inside the Winn-Dixie. Once inside, McDermid ordered the cashier, Ketsey Day Supinger, to open her register. When Supinger had difficulty complying, Rogers told McDermid to "forget it," and the two men left the store, apparently abandoning the robbery. Both men ran from the store toward the rental car with Rogers trailing slightly behind. At this point, McDermid said he heard an unfamiliar voice say, "No, please don't." The words were followed *375 by the sound of one shot, a short pause, and two more shots.
On the drive back to Orlando with McDermid, Rogers allegedly told McDermid he had seen the victim slip out the back of the store during the attempted robbery and because the victim "was playing hero," he shot him. The victim, Smith, was shot three times, once in the right shoulder and twice in the lower back. Police investigators later found three .45 caliber casings within six feet of the body. After the murder, Rogers and McDermid were identified as suspects in a subsequent robbery of a grocery store in Winter Park. In that case the police obtained a warrant to search Rogers' home and there seized a number of firearms, a .45 caliber handgun, and several boxes of spent .45 caliber shell casings. An analysis by experts indicated that the casings found near Smith's body had not been fired by the gun taken from Rogers' home. However, sixty-nine of the spent casings seized by police from the home had been fired by the same weapon that killed Smith.
At trial, Rogers represented himself, with the assistance of court-appointed counsel. As noted above, in his defense, Rogers continuously maintained that he was elsewhere at the time of the crime and presented evidence that McDermid had told others that Rogers was not with him in the Winn-Dixie robbery. After convicting Rogers, the jury reconvened the following day for the penalty phase and recommended death. In support of the death penalty, the trial court found five separate aggravating factors[2] and no mitigating evidence. On appeal, this Court rejected three of the five aggravators but affirmed Rogers' conviction and sentence.[3]See Rogers v. State, 511 So.2d 526 (Fla.1987). The United States Supreme Court denied Rogers' petition for writ of certiorari.[4]
Initially, Rogers filed a pro se motion to vacate his sentence and conviction under Florida Rule of Criminal Procedure 3.850. On January 11, 1990, the office of the Capital Collateral Representative (CCR) filed a motion to vacate on Rogers' behalf and amended it on February 28, 1990. The trial judge denied the motion after an evidentiary hearing. Subsequently, Rogers appealed to this Court, and on July 1, 1993, we reversed and remanded for a new postconviction evidentiary hearing based on the trial judge's failure to recuse himself. See Rogers v. State, 630 So.2d 513 (Fla.1993).[5] Rogers did thereafter accept *376 legal counsel,[6] who filed on Rogers' behalf an "Amendment/Supplement to Defendant's Prior Motion to Vacate, Set Aside, or Correct Sentence Pursuant to Fla. R.Crim. P. 3.850," which purported to supplement the 1990 motion filed by CCR. Specifically, that August 14 motion asserted, among other claims in support of relief, that: (1) the State failed to turn over numerous exculpatory documents pursuant to Florida Rule of Criminal Procedure 3.220 and Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in respect to McDermid and in respect to similar robberies being investigated at the time of the Winn-Dixie robbery in a joint law enforcement investigation by numerous agencies; (2) the defendant is entitled to a new trial, as new evidence reflects that a George William Cope committed the crimes of which defendant is convicted; and (3) the defendant is entitled to a new trial, as the alleged Brady violations and new evidence sufficiently undermine confidence in the verdict. After an evidentiary hearing, the trial court denied all relief.

APPEAL[7]
As his main claim on appeal, Rogers asserts that the State violated Brady by failing to provide him with exculpatory evidence in the possession of the police in respect to McDermid and other similar and connected robberies, a cassette tape of a pretrial meeting with McDermid, and evidence of a reward potentially showing witness bias, all of which Rogers could have used to bolster his defense or establish his innocence.
Under Brady, the government's suppression of favorable evidence violates a defendant's due process rights under the Fourteenth Amendment. See Brady, 373 U.S. at 86, 83 S.Ct. 1194 (suppression of confession is violation of Due Process Clause of Fourteenth Amendment). Therefore, errors involving the suppression *377 of evidence in violation of Brady raise issues of constitutional magnitude. See Kyles v. Whitley, 514 U.S. 419, 433-34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ("constitutional error" results from the suppression of favorable evidence by government). As such, determining whether a reasonable probability exists that the disclosure of the suppressed evidence would have changed the outcome of the trial is a mixed question of law and fact. See Hays v. Alabama, 85 F.3d 1492, 1498 (11th Cir.1996) The standard requires an independent review of the legal question of prejudice while giving deference to the trial court's factual findings and ensures the uniform application of the law. See Stephens v. State, 748 So.2d 1028, 1032-33 (Fla.1999) (applying mixed question of law and fact standard of review for issues of constitutional magnitude and stating that giving deference to a trial court's factual findings but independently reviewing legal questions ensures that the law is applied uniformly in decisions based on similar facts).

BRADY
In Brady, the United States Supreme Court held that the "suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. In Kyles, the Court wrote:
[United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985),] held that regardless of request [by defendant], favorable evidence is material, and constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." 473 U.S., at 682 [, 105 S.Ct. 3375] (opinion of Blackmun, J.); id., at 685 [, 105 S.Ct. 3375] (White, J., concurring in part and concurring in judgment).
Kyles, 514 U.S. at 433-34, 115 S.Ct. 1555 (emphasis added). Recently, in Young v. State, 739 So.2d 553 (Fla.1999), we recognized this emphasis placed on the materiality prong and stated:
[Although] defendants have the right to pretrial discovery under our Rules of Criminal Procedure, and thus there is an obligation upon defendant to exercise due diligence pretrial to obtain information... the focus in postconviction Brady Bagley analysis is ultimately the nature and weight of undisclosed information. The ultimate test in backwardlooking postconviction analysis is whether information which the State possessed and did not reveal to the defendant and which information was thereby unavailable to the defendant for trial, is of such a nature and weight that confidence in the outcome of the trial is undermined to the extent that there is a reasonable probability that had the information been disclosed to the defendant, the result of the proceeding would have been different.
Young, 739 So.2d at 559. One week after our decision in Young, the United States Supreme Court decided Strickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), confirming its analysis in Kyles. In Strickler, the court stated again the rules which must be applied to this case:
In Brady this Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of he good faith or bad faith of the prosecution." 373 U.S. at 87 [, 83 S.Ct. 1194]. We have *378 since held that the duty to disclose such evidence is applicable even though there has been no request by the accused, United States v. Agurs, 427 U.S. 97, 107 [, 96 S.Ct. 2392, 49 L.Ed.2d 342] (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, United States v. Bagley, 473 U.S. 667, 676 [, 105 S.Ct. 3375, 87 L.Ed.2d 481] (1985). Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 682[, 105 S.Ct. 3375]; see also Kyles v. Whitley, 514 U.S. 419, 433-34 [, 115 S.Ct. 1555, 131 L.Ed.2d 490] (1995). Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor." Id. at 438 [, 115 S.Ct. 1555]. In order to comply with Brady, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." Kyles, 514 U.S. at 437 [, 115 S.Ct. 1555].
These cases, together with earlier cases condemning the knowing use of perjured testimony, illustrate the special role played by the American prosecutor in the search for truth in criminal trials. Within the federal system, for example, we have said that the United States Attorney is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 [, 55 S.Ct. 629, 79 L.Ed. 1314] (1935).
This special status explains both the basis for the prosecution's broad duty of disclosure and our conclusion that not every violation of that duty necessarily establishes that the outcome was unjust. Thus the term "Brady violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidencethat is, to any suppression of so-called "Brady material"although, strictly speaking, there is never a real "Brady violation" unless the non-disclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.
Strickler, 527 U.S. at 280-82, 119 S.Ct. 1936 (emphasis added) (footnotes omitted). Here, there was a "real Brady violation" because there was nondisclosure of material information, which we conclude was so serious that there is a reasonable probability that the suppressed evidence would have produced a different result.

MERITS
Following the evidentiary hearing in the trial court on the rule 3.850 motion, the trial judge entered an order which states in pertinent part:
In the April 14, 1996 "Amended Motion," the Defendant raised four claims in support of his prayer for relief: (I) that the State failed to turn over numerous exculpatory documents pursuant to Rule 3.220 and Brady v. Maryland, 373 U.S. 83, 87 [, 83 S.Ct. 1194, 10 L.Ed.2d 215] (1963);1 (II) that Defendant is entitled to a new trial as new evidence reflects that a "George William Cope" committed the crimes of which Defendant was convicted; (III) that Defendant *379 is entitled to a new trial as the alleged Brady violations and new evidence sufficiently undermines confidence in the verdict; and (IV) that an unconstitutional prior conviction was used against Defendant at trial.
[n. 1] Citing Scott v. State, 657 So.2d 1129 (Fla.1995), to establish a Brady violation the Defendant must show: (1) that the State possessed evidence favorable to him; (2) that the evidence was suppressed; (3) that he did not possess the favorable evidence nor could he obtain it with any reasonable diligence; and (4) that had the evidence been disclosed to [the Defendant], a reasonable probability exists that the outcome of the proceedings would have been different.
As to clam (IV), Defendant filed this claim as an exercise of prudence while a "Petition for Writ of Habeas Corpus" was pending in another court. The petition has since been denied rendering the prior conviction valid. Relief is denied on this ground.
As to claim (I), Defendant offers the "Cope documents," the "McDermid Impeachment documents," and various other documents. The "Cope documents" consist of a collection of police reports garnered from various law enforcement agencies, the second confession of McDermid, and a cassette tape of a witness interview between the State Attorney's Office and McDermid.
First, this Court simply cannot hold that the police reports of various and sundry jurisdictions, of possibly unrelated crimes, were in the State's "possession." Any police report wherein two men robbed a store, which coincides roughly in time, place, and manner with McDermid's confession, is not the State's responsibility to produce. See Perry v. State, 395 So.2d 170 (Fla.1980). The materiality of these documents also concerned the Court. This Court does not consider these documents to be material. They represent a mere possibility that the defense might have been helped by this information, or might have affected the outcome of trial. It seems as though the use of the above documents, if admissible at all, would have cut both ways at trial. Id. at 174, citing United States v. Agurs, 427 U.S. 97 [, 96 S.Ct. 2392, 49 L.Ed.2d 342] (1976). Therefore, the first prong of Brady is not met.
Second, the police reports were at all times available to Defendant. Defendant argues that the titled "second McDermid confession" first led him to the police reports presented at the hearing by including times and dates that were not included in McDermid's first confession. But, Defendant did have McDermid's first written confession, which lists the same thirty-five crimes that make up the second confession. Defendant, at all times, could have deposed McDermid to obtain the very information Defendant now claims he needed during trial. The record reflects Defendant never once deposed McDermid in preparation for trial. Reasonable diligence dictates the main witness against Defendant would be deposed by Defendant. Thus, the third prong of Brady is not met.
Third, the nexus between the police reports and the reasonable probability that Defendant's trial would have ended with a verdict of not guilty is not adequately formed. It was not established that the police reports presented by Defendant represent the same robberies as those listed in McDermid's confession. Defendant presented but one witness from the police reports whose testimony failed to provide any relevant information as to "George Cope" nor Defendant. *380 The final prong of Brady has not been met.
The second McDermid confession fails to meet the third prong of the Brady test in the same manner as the police reports. The Defendant could have derived the information contained therein by exercising reasonable diligence by deposing McDermid. The Defendant had statements of all other witnesses that would lead to inconsistencies in McDermid's statements. Defendant was free to explore any inconsistencies through and by a deposition of McDermid.
The cassette tape, also presented in the "Cope Documents," fails the third prong of Brady for the same reason. There is no information included in the tape that was not otherwise available to Defendant. Also, nothing in the tape leads this Court to conclude that another verdict would be forthcoming. The fourth prong of Brady has not been met.
When the possible effect of all other documents associated with this claim, the above-mentioned documents, and the record are reviewed individually and collectively this Court is not compelled to find a reasonable probability exists that the outcome of Defendant's trial would have been different. Basically, the sum of the "maybe's" and "whatifs" is not greater than the sum of the jury's verdict and the propriety thereof. Relief on claim (I) is denied.
State v. Rogers, No. CF-83-1440, order at 2-3 (Fla. 7th Cir. Ct. order filed June 23, 1997).
We have carefully reviewed the entire record in this case and have concluded that we do not agree with the conclusion of the trial judge that there was no Brady violation in respect to the police reports. Applying Brady, Kyles, Strickler, and Young to the circumstances of this case, we conclude that the failure by the State to make available to Rogers the reports of the various law enforcement agencies that were investigating the robberies of retail establishments which occurred along the Interstate 4 corridor from the fall of 1981 through the spring of 1982 was a Brady violation.
Our holding is dictated by our conclusion that the police reports of the various law enforcement agencies in the joint investigation of the similar robberies were in the constructive possession of the prosecutor and were material documents within the scope of materiality as set out by Kyles, Strickler, and Young. Within these law enforcement agency reports was what is referred to as the second McDermid confession, the Cope document, and the cassette tape of the McDermid testimony preparation, all of which were clearly material.
The trial court concluded that this did not mean that this duty extended to "the police reports of various and sundry jurisdictions, of possibly unrelated crimes" or to "[a]ny police report wherein two men robbed a store, which coincides roughly in time, place and manner with McDermid's confession." We do not agree with the trial court's legal conclusion based upon the facts of this case.
The record in this case shows that, in various municipalities located near Interstate 95 and continuing on to Interstate 4 from Jacksonville to Tampa from the fall of 1981 through the spring of 1982, there had been a substantial number of robberies similar to the Winn-Dixie robbery in St. Augustine.[8] Various municipal and *381 county law enforcement agencies were cooperating in the investigation of the robberies and in attempting to identify and arrest the persons committing the robberies.
Police investigators from St. Augustine attended meetings and shared reports with and received reports from the other law enforcement agencies. Late in the spring of 1982, the robberies became inextricably linked when McDermid confessed to thirty-five of the robberies of various retail establishments along Interstate 4 which were the subject of the cooperative investigation among the law enforcement agencies. One of the robberies to which McDermid confessed was the Winn-Dixie robbery in St. Augustine. McDermid was the key prosecution witness in Rogers' trial.
During the course of pretrial discovery, Rogers requested all Brady material. Rogers took the deposition of the lead St. Augustine investigator, Sergeant Nicklo, on several occasions. Rogers requested during those depositions all of the St. Augustine Police Department records concerning this robbery and, on at least one occasion, asked to be supplied with the names of all persons who attended the joint law enforcement meetings concerning the various robberies.
Based upon our review of the pretrial record, we find that the reports and documents pertaining to the McDermid-linked robberies were in the constructive possession of the prosecutor in this case. We find that the trial court's conclusion that these documents and reports were "police reports of various and sundry jurisdictions, of possibly unrelated crimes" is not founded upon competent, substantial evidence.
We conclude that the following three items were in the State's possession and constitute Brady violations:
(1) The second confession by McDermid. McDermid wrote a list of robberies to which he confessed, and Rogers obtained a copy of this first confession. However, McDermid later wrote a more extensive list of robberies and stated in the second confession that Rogers participated in each robbery listed. Rogers was not given a copy of this second confession. There is no doubt that this second confession was in the State's possession in this case since that confession has on it the initials of Detective Edmonson, who was a police investigator in the Winn-Dixie case. For the reasons stated below, the second confession was material, and the Court's conclusion that the availability of McDermid's first confession sufficed is legally erroneous.
(2) The report from the Jacksonville police concerning a Pantry Pride robbery in Jacksonville in December 1981. This report, dated January 30, 1982, states in pertinent part:
"The 2nd lead in this case is information developed at the beaches area on suspects named George William Cope, Carolyn Woods, and Dennis L. Herman. A confidential informant reported that he overheard a conversation with these subjects in a bar at the beaches area that they were possibly involved or he was led to believe that they may have been involved in the robbery/murder of the Winn-Dixie Manager in St. Augustine that occurred after this robbery occurred. The subject forwarded the name of Billy Cope to this office .... [t]he writer requested records on all these people from the Ohio police and instead of sending them to me, they sent them to Sg. Nicklo in St. Augustine who is working the robbery/murder there. The writer is still trying to get this information from Ohio police or Sgt. *382 Nicklo, but as of this date has been unsuccessful in getting it."

(Emphasis added.)
(3) A cassette tape of a witness preparation conference in which McDermid discusses what his trial testimony will be with one of the prosecutors and Detective Edmonson.
We also do not agree with the trial court's conclusion that the documents were not material under Brady. The overarching theory of Rogers' defense was that he had been misidentified and was not McDermid's accomplice. The State's case, to a substantial extent, relied upon McDermid's testimony that Rogers was the other person involved in robbing the Winn-Dixie and who fired the fatal shot resulting in the murder.

McDermid's Second Confession and Cope Documents[9]
The record reflects that McDermid provided the State with two written confessions prior to the trial for the Winn-Dixie murder. The first confession was made in August 1983, and it listed some thirty-five armed robberies, including store names, cities, and estimated stolen dollar amounts. This confession was turned over to Rogers. However, a second confession, made in January 1984 and captioned "A Short Synopsis of All the Robberies that I, Thomas J. McDermid, and Jerry Layne Rogers Committed" was not disclosed. A review of the record reveals that these confessions are different in material ways. The record reflects that the second confession expands upon the robberies listed in the first confession, implicates Rogers in all of the robberies, and gives additional details, including street addresses, approximate dates, and a description of each event. It is undisputed that this second written and detailed confession was not turned over to Rogers.
Rogers argues that he could have used this second confession to impeach McDermid by revealing inconsistencies between McDermid's confession and the actual facts drawn from the police reports of those robberies. Additionally, Rogers claims that the expanded facts in the second confession could have played an integral role in casting guilt on McDermid and on another suspect, George William Cope,[10] and in questioning McDermid's motives in confessing and implicating Rogers.
As stated earlier in this opinion, previously undisclosed police reports contain statements from two confidential informants concerning Cope's involvement in the Winn-Dixie crime for which Rogers was convicted. A Jacksonville Sheriff's Office report involving a Pantry Pride robbery reflects that a confidential informant reported overhearing a conversation in a bar between subjects Cope, Carolyn Woods, and Dennis Herman suggesting that they may have been involved in the Winn-Dixie robbery and murder at issue here. The report also contains a statement about a lead in the case in which Cope was a suspect. In addition, the Jacksonville Sheriff's Office reports contain an undated handwritten statement where a confidential informant says that he was with Cope and another as they discussed going to do a "23 and 5." Rogers asserts that the number 5 corresponds to the shorthand used in another section of *383 the same notes to denote this Winn Dixie robbery and murder. Cope's name also appears next to two Publix robberies committed on December 3, 1981, and January 11, 1982. In his detailed confession, McDermid claimed that he and Rogers, not Cope, had robbed the Publix stores on those dates. Moreover, at least two other police records, which were introduced from investigations of a Publix robbery at Ormond Beach, committed one month before the Winn-Dixie robbery, and a robbery of a Long John Silver's restaurant in South Daytona, contain eyewitness descriptions of a robber matching Cope's description. Again, as to both of these crimes, McDermid had implicated Rogers rather than Cope as his accomplice.[11]
The trial judge found that because McDermid's second confession and the resulting police reports also implicated Rogers in other crimes they were not favorable to Rogers and hence not subject to Brady's rule of production. However, based on a review of the record and analyzing the possible use of the evidence in support of the defense asserted by Rogers, it is apparent that most of this evidence is favorable, and Rogers could have used it to bolster his defense in at least two critical ways.
First, and most importantly, the evidence could have been used to show that another person, Cope, and not Rogers was McDermid's partner in the Winn-Dixie crime, as is reflected by the many witness descriptions of the Winn Dixie robbers that match Cope and not Rogers. See Kyles v. Whitley, 514 U.S. 419, 442-43, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (eyewitness statements to police describing assailant as five feet four inches or five feet five inches tall and of medium build that matched description of an alternative suspect was clearly favorable to accused, who was six feet tall and thin). Second, the undisclosed information could have been used to directly impeach McDermid's testimony at trial and show that Cope, not Rogers, was McDermid's frequent accomplice in other robberies where McDermid claimed Rogers participated. This would have been extremely helpful to Rogers since the State's case for conviction was substantially predicated upon the testimony of McDermid, a codefendant and the State's chief witness, who entered into a plea agreement with the State to save his life. In addition, the State's case was based upon the fact that McDermid and Rogers had committed other robberies together, hence the implication that they did the Winn-Dixie robbery together. However, a review of the police reports reveals that many of the descriptions of the robbers in the Winn-Dixie and other cases given by witnesses match Cope rather than Rogers, and they provide a name that Rogers could have attached to the alternate suspect he was trying to show as *384 involved in this crime. As noted above, Rogers presented extensive testimony and evidence of his innocence in his defense at trial and has continuously maintained that he was elsewhere at the time of the crime.[12]

Cassette Tape
The next category of Brady evidence alleged to have been withheld from Rogers is a cassette tape of a June 19, 1984, telephone conversation among the State's investigator, Flynn Edmonson; the prosecutor, John Whiteman; and McDermid, which Rogers claims revealed substantial coaching of McDermid for his trial testimony. The tape cassette, which was transcribed by an attorney of Covington & Burling, provided two excerpts reflecting the State's attempt to influence McDermid's testimony.
The first excerpt reflects McDermid telling the State that, after the robbery, he had reached the getaway car first and then laid down on the floorboard in the back seat while his partner, Rogers, lagged behind, shot the store manager, and then entered the car and drove away. The transcript of the tape reflects McDermid stating that Rogers arrived at the car about ten seconds after he had reached the car. After this representation, the transcript reflects the State explaining to McDermid that there were two witnesses who stated that they only saw McDermid run to the getaway car, get into the driver's seat, and drive away. At that point and after suggesting to McDermid that maybe the witnesses were mistaken or that maybe they just had not seen Rogers because he was too close behind, McDermid stated, "[Rogers] wasn't far behind me. I'll say that."
The second excerpt reveals McDermid's response when asked where the getaway car had been parked was that it was parked
[o]n the other side of the Holiday Inn, about 5 parking spaces down from the office.... It would be somewhere in those first five. Ah, I remember we didn't want to park right next to the stairwell [the first spot] and decided to park a couple down so I could look on both sides you know what I mean, without the stairwell being in the way.... Not being parked too close to the office too was another thing I had in mind.
However, later in the conversation, when again he was asked where he had parked, McDermid responds: "I think it was either the first or the second slot, but I can't be sure." In response, Mr. Edmonson stated that there were several State witnesses who were adamant in their testimony that McDermid had parked the car in the first parking space and that "it would probably be a better idea if it was parked in the first spot .... I would think that you would have parked in the first space." In response, McDermid stated, "That's another thing. I mean like you said we might have parked in the first one." At trial McDermid testified that the getaway car was parked in the first spot, next to the stairwell.
This evidence of coaching and conflicting accounts clearly was favorable to Rogers. Whenever the government's case depends almost entirely on the testimony of one witness, without which there can be no conviction, that witness's credibility is an important issue in the case. See Giglio v. United States, 405 U.S. 150, 154-55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); United States v. Meros, 866 F.2d 1304, 1309 (11th *385 Cir.1989); Brown v. Wainwright, 785 F.2d 1457, 1465 (11th Cir.1986); Craig v. State, 685 So.2d 1224, 1226 (Fla.1996). In this case, McDermid was the State's chief witness, and with the tape, Rogers could have impeached McDermid and shown the degree to which the State had coached him to overcome the inconsistencies between his testimony and that of the other State witnesses. This was especially important because the State did present eyewitnesses who testified that they saw someone drive off who met McDermid's description. This testimony conflicted sharply with that of McDermid, who testified that he laid down in the back seat and waited until Rogers came and got in the driver's seat and drove off.
This evidence would have been particularly compelling given the confused testimony provided by an alleged eyewitness, Ms. Ketsey Day Supinger, the Winn-Dixie cashier. At trial, Supinger, who was five feet nine inches or five feet-ten inches tall, testified that the buck-toothed robber who confronted her and whose description fit McDermid was about one inch shorter than she was. More importantly, she described the second robber, whom she later identified as Rogers, as being taller than the robber who confronted her. That description would make the second robber at least five feet nine inches tall. Rogers' driver license, however, lists him as five feet six inches tall. Cope, on the other hand, actually matches this description given by Supinger. Had Rogers known that Cope matched the description given by Supinger, he could have conducted further investigation to find other evidence linking Cope to McDermid and the Winn-Dixie crime, such as the information that he later discovered from Roger Wimmer, Mathew Armitage, and Ronald Heath which now serves as the basis of his newly discovered evidence claim. In its closing argument, the State conceded that Supinger was confused as to her testimony.
In reviewing the impact that withheld materials might have on defendants, courts must assess the cumulative effect of the evidence. See Kyles, 514 U.S. at 441, 115 S.Ct. 1555. In other words, courts should assess the importance of the suppressed materials taken together. See id. In addition, courts should consider not only how the State's suppression of favorable information deprived the defendant of direct relevant evidence but also how it handicapped the defendant's ability to investigate or present other aspects of the case. See United States v. Bagley, 473 U.S. 667, 683, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (reviewing court may consider directly any adverse effect that prosecutor's failure to respond to request for information from defendant might have had on preparation or presentation of defendant's case).
The materials that the State withheld from Rogers are bedrock Brady materials of the sort upon which many courts have relied in ordering new trials. We conclude that the individual as well as the cumulative effect of the suppression of the materials discussed above indeed undermines confidence in the outcome of the trial.
In light of this Brady error, we conclude that Rogers is entitled to a new trial. Accordingly, we reverse the order denying Rogers' motion for postconviction relief and remand to the trial court with directions that a new trial be conducted without delay.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
NOTES
[1] McDermid was allowed to plead guilty in several robbery cases and has long since been released from custody.
[2] The five aggravating factors found by the trial court were: (1) Rogers had a prior conviction of a violent felony; (2) the murder was committed while Rogers was in flight from a robbery; (3) the murder was committed to avoid or prevent a lawful arrest; (4) the murder was committed for pecuniary gain; and (5) the murder was committed in a cold, calculated, and premeditated manner.
[3] The rejected aggravators were: (1) the murder was committed for pecuniary gain; (2) the murder was committed to avoid or prevent lawful arrest; and (3) the murder was committed in a cold, calculated, and premeditated manner. Additionally, we found the error in admitting the hearsay testimony of Steven Young, Rogers' brother-in-law, alleging ill will between Rogers and his mother-in-law, Maxine Arzberger, to be harmless because the substance of the hearsay testimony had already been presented to the jury during the cross-examination of Arzberger herself. Second, we found the pending charges harmless because Reynolds was only one of the three witnesses testifying to statements that Thomas McDermid, not Rogers, was Smith's actual murderer.
[4] Rogers v. Florida, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988).
[5] Although Rogers' appeal raised sixteen issues and numerous subissues, we addressed only the single procedural issue of the trial judge's recusal and provided no guidance to the trial court on remand. See Rogers v. State, 630 So.2d 513, 514-15 (Fla.1993).
[6] The law firm of Covington & Burling became Rogers' counsel of record on November 5, 1995, and they have provided legal services to him since that time. They are the counsel who filed Rogers' current 3.850 postconviction motion.
[7] Initially, we address the State's claim that Rogers' Brady claim is time-barred. The State alleges that when one of Rogers' attorneys announced Rogers' intent to proceed only on the claims that were addressed in the 1996 amended motion, Rogers waived all matters that were raised in the 1990 CCR motion. According to the State, this waiver made the 1996 Brady claim a new one based on old information, therefore rendering the new claims procedurally barred under the two-year window provided for in rule 3.850. Additionally, because the information upon which the current 1996 motion was based was available to Rogers in 1990, the State argues that the 1996 motion is barred by rule 3.850, which requires that postconviction relief motions filed after January 1, 1994, be filed within one year from the date the new facts become known. See Fla. R.Crim. P. 3.850(b) (1994); see also Adams v. State, 543 So.2d 1244 (Fla.1989). Although the trial court found merit to the State's argument that the claims filed in the 1996 motion were procedurally barred under the two-year limitation prescribed by rule 3.850, it nevertheless thought it more justiciable to rule on the merits of Rogers' motion in light of the evidence presented to the court.

We do not agree with the State's argument. We have held that the two-year time limitation does not preclude the enlargement of issues raised in a timely-filed initial motion for postconviction relief. See Brown v. State, 596 So.2d 1026, 1027 (Fla.1992). Upon a comparison of the two motions, we find that the 1996 motion simply expanded the Brady claim asserted in the 1990 motion and both motions advanced the same factual allegations. Additionally, at the aforementioned hearing, Rogers' counsel merely stated that Rogers "intended to proceed only on the claims that have been filed in the amended motion," one of which was the Brady claim asserted in the 1990 motion. Therefore, neither counsel nor Rogers waived the Brady claim.
[8] Two of these robberies were used by the State at the trial as Williams rule evidence. See Rogers, 511 So.2d at 531.
[9] The record demonstrates that the police agencies in all jurisdictions in Florida where there was evidence that McDermid and Rogers had committed robberies shared information in an attempt to prosecute those robberies as well as the Winn-Dixie robbery-murder.
[10] Cope was identified in the police reports of the Jacksonville Sheriff's Office.
[11] The State asserts that police reports regarding criminal matters are traditionally excluded from the public records hearsay exception and thus are not admissible as substantive evidence in criminal trials. See § 90.803(8), Fla. State. (1997); see, e.g., Hendrieth v. State, 483 So.2d 768, 769 (Fla. 1st DCA 1986) (police report not admissible against defendant under section 90.803(8)). Therefore, the State alleges that as a result, Rogers' claim must fail. However, withheld information, even if not itself admissible, can be material under Brady if its disclosure would lead to admissible substantive or impeachment evidence. See Martinez v. Wainwright, 621 F.2d 184, 188 (5th Cir.1980) (citing State v. Crawford, 257 So.2d 898, 900-01 (Fla.1972)). While the actual police reports may not be admitted as substantive evidence, they can still serve as the basis for Rogers' Brady claim to the extent he could have investigated and used the information contained in the reports. Moreover, any inconsistent statements made by McDermid in the police reports surely could have been admissible to further impeach his testimony.
[12] Specifically, Rogers, his wife, and other family members testified that on the night of the murder, Rogers attended a cookout with family members and a couple named John and Laura Norwood.