902 So.2d 775 (2005)
James FLOYD, Appellant,
v.
STATE of Florida, Appellee.
No. SC03-865.
Supreme Court of Florida.
March 24, 2005.
Rehearing Denied May 13, 2005.
*776 Neal A. Dupree, Capital Collateral Regional Counsel-South, Martin J. McClain, Special Assistant CCRC and John P. Abatecola, Assistant CCRC, Fort Lauderdale, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL and Carol M. Dittmar, Senior Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
James Floyd, a prisoner under sentence of death, appeals the trial court's denial, after an evidentiary hearing, of postconviction relief. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Because the record demonstrates without contradiction that the State withheld substantial exculpatory evidence from Floyd, we reverse the order denying Floyd's motion for postconviction relief on the authority of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and remand this case to the circuit court with directions that the conviction be vacated and a new trial conducted.

FACTS AND PROCEEDINGS TO DATE
The evidence relied upon to convict Floyd was previously summarized by this Court as follows:
The victim was found dead in one of the bedrooms of her home on the evening of Tuesday, January 17, 1984. She was last seen alive on the afternoon of January 16, 1984, when she cashed a check at her bank. According to the testimony of the medical examiner, she had been killed sometime that afternoon or evening by a stab wound to her chest. When the police arrived at the victim's home on January 17, 1984, the back door was unlocked, and there were no signs of a forced entry. In the room in which they found the victim, there were fresh "pry marks" beneath the window, indicating that someone had attempted to exit from that window.
On the afternoon of the victim's death (Monday, January 16), Floyd had cashed a check for $500 from the victim's account. He was arrested after attempting to flee from the police when he tried to cash a second check for $700 on the same account two days later (Wednesday, January 18). When questioned by the police, Floyd admitted forging the $700 check, explaining that he had found the checkbook on Tuesday near a dumpster. He subsequently revised his story when confronted with the police knowledge that he had cashed the $500 check on Monday. In addition, he admitted owning a brown jacket that was found outside the bank where he was arrested. A sock soaked with blood of the victim's *777 blood type (which was not the defendant's blood type) was found in one of the jacket pockets.
Floyd v. State, 497 So.2d 1211, 1212-13 (Fla.1986). Based upon this evidence, and the testimony of a jailhouse informant, this Court affirmed Floyd's conviction, but set aside his death sentence and remanded for a new sentencing proceeding. Upon resentencing, the jury recommended a death sentence by a vote of eight to four, and the trial court again sentenced Floyd to death. Floyd v. State, 569 So.2d 1225 (Fla.1990).
Subsequently, Floyd moved for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.851, and the trial court summarily denied all claims. On appeal, this Court reversed and remanded the case for an evidentiary hearing on Floyd's claims that the State had failed to disclose evidence favorable to Floyd's defense, including evidence of other suspects as well as evidence impeaching the credibility of the jailhouse informant[1] and on his ineffective assistance of counsel claims. See Floyd v. State, 808 So.2d 175, 187 (Fla.2002).[2] On remand, the trial court held an evidentiary hearing and denied these claims as well as Floyd's claim that he is mentally retarded.
Floyd now appeals the trial court's denial of his claims and the trial judge's refusal to recuse himself, and he raises a claim under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Because we find Floyd's claim that the State wrongfully withheld exculpatory evidence in violation of Brady to be dispositive, we do not reach a decision with respect to Floyd's remaining claims.

ANALYSIS

Brady v. Maryland Claim
In Rogers v. State, 782 So.2d 373 (Fla. 2001), this Court went to some lengths to explain the State's constitutional obligation to disclose exculpatory evidence under the U.S. Supreme Court's decision in Brady. We believe that explanation is equally pertinent to our analysis here:
In Brady, the United States Supreme Court held that the "suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. In Kyles, the Court wrote:

[United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985),] held that regardless of request [by defendant], favorable evidence is material, and constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." 473 U.S., at 682, 105 *778 S.Ct. 3375 (opinion of Blackmun, J.); id., at 685, 105 S.Ct. 3375 (White, J., concurring in part and concurring in judgment).

Kyles, 514 U.S. at 433-34, 115 S.Ct. 1555 (emphasis added). Recently, in Young v. State, 739 So.2d 553 (Fla.1999), we recognized this emphasis placed on the materiality prong and stated:
[Although] defendants have the right to pretrial discovery under our Rules of Criminal Procedure, and thus there is an obligation upon defendant to exercise due diligence pretrial to obtain information ... the focus in postconviction BradyBagley analysis is ultimately the nature and weight of undisclosed information. The ultimate test in backward-looking postconviction analysis is whether information which the State possessed and did not reveal to the defendant and which information was thereby unavailable to the defendant for trial, is of such a nature and weight that confidence in the outcome of the trial is undermined to the extent that there is a reasonable probability that had the information been disclosed to the defendant, the result of the proceeding would have been different.

Young, 739 So.2d at 559. One week after our decision in Young, the United States Supreme Court decided Strickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), confirming its analysis in Kyles. In Strickler, the court stated again the rules which must be applied to this case:
In Brady this Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. We have since held that the duty to disclose such evidence is applicable even though there has been no request by the accused, United States v. Agurs, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 682, 105 S.Ct. 3375; see also Kyles v. Whitley, 514 U.S. 419, 433-34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor." Id. at 438, 115 S.Ct. 1555. In order to comply with Brady, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." Kyles, 514 U.S. at 437, 115 S.Ct. 1555.
These cases, together with earlier cases condemning the knowing use of perjured testimony, illustrate the special role played by the American prosecutor in the search for truth in criminal trials. Within the federal system, for example, we have said that the United States Attorney is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." Berger v. *779 United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).
Rogers, 782 So.2d at 377-78. In Rogers, we ultimately determined that there was a Brady violation and the defendant was entitled to a new trial because of the violation.

Application of Brady

This Court has stated that the determination of whether a Brady violation has occurred is subject to independent appellate review. See Cardona v. State, 826 So.2d 968, 973 (Fla.2002); Way v. State, 760 So.2d 903, 913 (Fla.2000) ("Although reviewing courts must give deference to the trial court's findings of historical fact, the ultimate question of whether evidence was material resulting in a due process violation is a mixed question of law and fact subject to independent appellate review.").
In order to establish a Brady violation, a defendant must prove:
[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued.
Carroll v. State, 815 So.2d 601, 619 (Fla. 2002) (quoting Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). In applying these three elements, the evidence must be considered in the context of the entire record. Carroll, 815 So.2d at 619 (citing State v. Riechmann, 777 So.2d 342, 362 (Fla.2000); Sireci v. State, 773 So.2d 34 (Fla.2000); Haliburton v. Singletary, 691 So.2d 466, 470 (Fla.1997)). Here, the trial court found that Floyd failed to meet his burden under two of the Brady prongs: he failed to establish that the State withheld exculpatory or impeachment evidence from the defense, and he failed to establish materiality under Brady. The trial court's error with respect to each of these issues will be discussed in turn.

Exculpatory Evidence Suppressed by State
Initially, it appears clear that the first two prongs of the Brady analysis have been demonstrated on the record without dispute. That is, there is little dispute that the State possessed exculpatory evidence that it failed to provide to Floyd. First, the record reflects without dispute that the defense was never informed that immediately after the murder, police interviewed Tina Glenn, a neighbor of the victim at the time of the murder.[3] *780 *781 The exculpatory nature of the interviews with witness Glenn is apparent. The interviews reflect that Glenn told police that during the daylight hours on the afternoon of January 16, 1984, within the range of time the state medical examiner determined the murder occurred, she observed two white males park an automobile in the victim's driveway and then enter and later exit the victim's home. In the interviews, Glenn gave detailed descriptions of the men and the vehicle they drove, as well as detailed descriptions of their actions. Glenn told police that while the men were in the house she heard "scrambling noises," as if the house was being searched. She stated that the suspects hurriedly emerged from the home, slammed the door, looked around "suspiciously," and sped off in their vehicle. According to one of the police reports, Glenn was shown a photographic lineup of suspects, from which she indicated that one picture looked "similar" to one of the suspects.
We conclude that the exculpatory nature of this evidence is apparent, since the interviews present direct evidence of two other persons who may have committed the crime for which Floyd was charged. In addition, the record reflects that other evidence, although not of the magnitude of the neighbor's evidence, was also withheld. This evidence included letters written by the jailhouse informant seeking a deal with the State for his assistance, as well as other information contained in police reports that was inconsistent with evidence presented by the State at trial.[4]
The second requirement of Brady is that the defendant must demonstrate that the State failed to disclose the exculpatory evidence. Paraphrasing federal law on the *782 subject, this Court has stated: "[W]ithheld information, even if not itself admissible, can be material under Brady if its disclosure would lead to admissible substantive or impeachment evidence." Rogers v. State, 782 So.2d 373, 383 n. 11 (2001). In Rogers we held that the contents of certain police reports, some of which were not even from the agency investigating the crime, should have been disclosed. See Rogers v. State, 782 So.2d 373, 381-85 (Fla.2001) (new trial ordered because "bedrock" Brady material was withheld: a confession of the State's star witness, a cassette tape of the witness's preparation conference with a prosecutor, and a police report about a related robbery).
Here, of course, the interviews were conducted by the police agency having primary responsibility to investigate this crime. Further, it is undisputed in this case that the State did not disclose to the defense any of witness Glenn's observations, or even that she was a witness in this case. Under Brady, Rogers, and our other decisions applying Brady, there can be no question that the State was obligated to disclose this information.
The trial court found that Floyd failed to show that the State was obligated to turn over the Tina Glenn interviews and other information, erroneously relying on case law on the confidentiality of police reports and the general proposition that the State is not obligated to provide all investigatory information possessed by the police to the defense.[5] However, it is apparent that the substantive information contained within the police reports identifying a neighbor of the victim as being an eyewitness to the presence of other suspects at the victim's home at the time of the murder qualified as Brady material. See Rogers. Thus, the trial court erred when it found that the State was not obligated under Brady to turn over the substance of the witness interviews and other information contained within the police reports but not disclosed to Floyd.

Materiality
The focus on an accused's due process rights when the State withholds important exculpatory evidence is reflected by the United States Supreme Court statement in Brady that:
The principle ... is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.... A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice....
373 U.S. at 87-88, 83 S.Ct. 1194. Further, the United States Supreme Court has emphasized that prejudice is measured by determining "whether `the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Strickler, 527 U.S. at 290, 119 S.Ct. 1936 (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).[6] Confidence is undermined when *783 "there is a reasonable probability that had the information been disclosed to the defendant, the result of the proceeding would have been different." Young v. State, 739 So.2d 553, 559 (Fla.1999). We have recognized that "`[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" Id. at 557 (quoting Kyles, 514 U.S. at 434, 115 S.Ct. 1555). When the suppressed evidence undermines our confidence in the result of the trial the defendant is entitled to have his conviction set aside.
For example, in Rogers we explained our materiality analysis:
In reviewing the impact that withheld materials might have on defendants, courts must assess the cumulative effect of the evidence. See Kyles, 514 U.S. at 441, 115 S.Ct. 1555. In other words, courts should assess the importance of the suppressed materials taken together. See id. In addition, courts should consider not only how the State's suppression of favorable information deprived the defendant of direct relevant evidence but also how it handicapped the defendant's ability to investigate or present other aspects of the case. See United States v. Bagley, 473 U.S. 667, 683, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (reviewing court may consider directly any adverse effect that prosecutor's failure to respond to request for information from defendant might have had on preparation or presentation of defendant's case).
The materials that the State withheld from Rogers are bedrock Brady materials of the sort upon which many courts have relied in ordering new trials. We conclude that the individual as well as the cumulative effect of the suppression of the materials discussed above indeed undermines confidence in the outcome of the trial.
In light of this Brady error, we conclude that Rogers is entitled to a new trial.
782 So.2d at 385. Similarly, in Young v. State, 739 So.2d 553 (Fla.1999), the defendant also discovered post-trial the existence of previously undisclosed witness information during postconviction public records proceedings. Id. at 556. This Court ultimately concluded that the information was material to the sentence of death, although not to Young's convictions. Id. at 560. However, the analysis this Court employed is instructive to the case at bar:
However, we have also recognized, as again made clear by the quoted portions of the United States Supreme Court in Kyles, that the focus in postconviction Brady-Bagley analysis is ultimately the nature and weight of undisclosed information. *784 The ultimate test in backward-looking postconviction analysis is whether information which the State possessed and did not reveal to the defendant and which information was thereby unavailable to the defendant for trial, is of such a nature and weight that confidence in the outcome of the trial is undermined to the extent that there is a reasonable probability that had the information been disclosed to the defendant, the result of the proceeding would have been different.
Id. at 559. In applying that test to the facts of Young, this Court stated that "the prosecution's failure to disclose these documents was a failure to disclose information that could have corroborated defense witnesses and thus could have been favorable evidence for the defense." Id. at 560. As in Rogers, we concluded in Young that we could not have confidence in the fairness of the penalty phase proceedings because of the State's Brady violation and we directed a new proceeding be conducted.

Materiality in This Case
In the case at bar, Floyd maintained his innocence of the murder throughout the trial in his defense. There was no direct evidence of Floyd's guilt, such as eyewitness testimony or DNA blood evidence or fingerprint evidence at the victim's home. Rather, this was a circumstantial case in which the most damaging evidence was arguably Floyd's confession through a jailhouse informant. It is apparent that the Tina Glenn information would be of great importance to the defense because it identified other suspects and would have been consistent with Floyd's innocence defense.
Although we upheld the defendant's conviction on appeal, Floyd v. State, 497 So.2d 1211, 1212 (Fla.1986), it is clear that the case against the defendant was not among the strongest we have encountered. The only physical evidence specifically linking the defendant to the crime was the victim's checkbook, which the defendant used to forge checks on the afternoon of the murder and again two days later. The remainder of the physical evidence only linked the defendant to the crime at a high level of generality. For example, the sock found in the defendant's jacket was stained with type O blood, which was the victim's blood type but is also the blood type of roughly 45 percent of the American population.[7] Similarly, the hair fragments found in the victim's bedroom were identified only as "Negroid," which applies to a large percentage of the population. And the tire tracks on the victim's driveway were identified only as being similar to the treads of Japanese motorcycles, which were so popular in the mid-1980s that they became the target of a federal antitrust investigation.[8]
The jury may have been justified in finding the defendant guilty of first-degree murder because all of this circumstantial evidence, together with the defendant's alleged confession and his false alibi, pointed uniformly in the direction of guilt, whereas very little (if any) evidence pointed in the direction of innocence. But that is no longer the case. The defendant has now identified important information that was withheld from him by the State and that would have been favorable to his defense.
The most important evidence that the State withheld from the defendant is the eyewitness account of Tina Glenn, a neighbor *785 of the victim who was interviewed twice only days after the murder. According to the report from the first interview, Glenn told a detective that she last saw the victim standing outside of her home at 11 a.m. on the day of the murder. Then, while watching the show "All My Children" between 1:30 and 2 p.m., Glenn heard a car pull up to the victim's house. Two white males emerged from the car and with a "fast stride" approached the house. They knocked on the door, and "although [Glenn] did not see the victim they were led into the house." About thirty to forty-five minutes later, Glenn heard a door slam at the victim's house. She watched as the two males returned to their car and, after "looking around suspiciously," sped off.
The second interview, which was conducted at the police station, revealed slightly different information. According to the report, Glenn claimed that she heard a car pull up to the victim's house between 1 and 1:30 p.m. on the day of the murder. Two white males stepped out of the car, walked "fairly fast" to the front door of the house, and knocked. They then "walked into the residence," although Glenn "did not see the victim actually answer the door." Glenn then went outside to walk her dog, at which time she observed one of the men on the victim's back porch. She also heard what she called "scrambling noises" inside the victim's house, which sounded "like people were going through drawers and other things in the house." About an hour after the two men arrived, Glenn heard the sound of the front door slamming (which she distinguished from the sound of the back door) and watched as the men went back to their car "almost running and looking around very suspicious." One said to the other, "Come on. Let's go." Glenn recalled that the vehicle sped off with its tires squealing, possibly running a nearby stop sign.[9]
Glenn's eyewitness account is unsettling, given the circumstantial nature of this case. She places two white men in a car as contrasted with the defendant, a black man who was allegedly driving his motorcycle at the victim's house within the estimated time frame of the murder. She also identifies "very suspicious" behavior that would be consistent with the crime.
In fact, all of the Brady evidence elicited below, including impeachment evidence of the jailhouse informant, could have been persuasive for the defense when weighed against the State's case, especially when considered in the light of the heavy burden upon the State to prove guilt in a criminal case beyond any reasonable doubt and the legal requirement that the jury's verdict be unanimous. In effect, this means that only one juror finding reasonable doubt would change the outcome. Glenn's evidence not only identified other suspects, but it also failed to include the defendant *786 or anyone meeting his description as being present at the victim's residence at the time of the crime.
The rest of the suppressed evidence is not as powerful, but does raise further doubts about the reliability of a crucial piece of evidence: the defendant's alleged confession. The only witness to that confession was the defendant's cellmate, Gregory Anderson. As the circuit court noted in its order denying relief, Anderson's credibility was undermined by defense counsel at trial:
During a lengthy cross-examination, [defense counsel] aptly demonstrated to the jury that Anderson had lied to law enforcement by using different aliases in the past. [Counsel] also elicited testimony from Anderson indicating he lied about his origin/whereabouts to law enforcement on a previous occasion. Additionally, [counsel] brought out on cross-examination that Anderson harbored a certain animus toward black people. [Counsel] then impeached Anderson with prior inconsistent statements. Subsequently, [counsel] proceeded to quite effectively discredit Anderson by questioning him concerning his letter writing to Judge Walker [which contained statements that Anderson would "do anything to get out of jail"], his prior involvement as a "snitch" in other cases, and his apparent favorable treatment in prior cases.
(Emphasis added.) The evidence suppressed by the State would have increased Anderson's credibility problem. Undisclosed letters that Anderson wrote to the prosecutor and to a detective reveal that he sought a reduction of his robbery charge in exchange for his testimony against the defendant, and that he claimed he "would rather die [than] go to prison."
Further, one reason that the defendant's confession carried some weight at trial, despite Anderson's lack of credibility, was the apparent discovery of corroborating evidence at the scene of the crime. The defendant allegedly confessed that he murdered the victim after she surprised him during the course of a burglary. Witnesses for the State testified that "what appeared to be fresh pry marks" were found on two window frames inside the defendant's bedroom, which seemed consistent with the "surprise" element of the defendant's confession. Witnesses also testified to the discovery of "Negroid" hair fragments in the victim's bedroom. These discoveries may have convinced the jurors that the defendant did, in fact, confess to the crime as Anderson claimed.
However, suppressed police reports cast doubt on both of these corroborating discoveries. The police reports are entirely inconsistent as to whether fresh pry marks were found on either of the two window frames in the victim's bedroom. One report states that "there are fresh pry marks on the [west] window" but that pry marks on the north window "did not appear to be as fresh." Strangely, the exact opposite conclusion appears in a report by the detective who testified to the fresh pry marks at trial. According to that report, the north window had fresh pry marks but the west window did not. This inconsistency has not been explained. The police reports also leave ambiguity as to whether the hair fragments in the defendant's bedroom could plausibly have come from the murderer. One report states that the FDLE lab located "some negro body hair fragments" on "the sheet and the white bedspread in the victim's bedroom." But another report states that the victim's bed "was fully made" when her body was found lying on it. The defendant argues that the hair fragments on the sheet and bedspread must have come from someone other than *787 the murderer, because the murder occurred while the bed was fully made.
Although these suppressed police reports would not have refuted the evidence corroborating the defendant's confession, they at least would have given the defendant an avenue through which to challenge that evidence as being mixed or unreliable. With the corroborating evidence in question, it would have been even more difficult for the jurors to rely on the testimony of the jail cellmate, whose suppressed letters reveal that he may have been even less credible than the jury realized.
After collectively examining the evidence suppressed by the State, it is apparent that it could have provided a basis for reasonable doubt in the minds of some jurors. The case against the defendant was, from the beginning, a circumstantial one. While at the time of trial, those circumstances may have seemed to point in the direction of guilt, the circumstances have been changed considerably by the suppressed evidence, which "put[s] the whole case in ... a different light." Strickler, 527 U.S. at 290, 119 S.Ct. 1936 (quoting Kyles, 514 U.S. at 435, 115 S.Ct. 1555). The suppressed evidence not only identifies two other men acting "very suspiciously" at the location of the murder within the time frame of the murder, but also raises additional concerns about whether the defendant truly confessed to the crime. It therefore undermines our confidence in the defendant's conviction.[10]
The State claims that this case is similar to Carroll v. State, 815 So.2d 601 (Fla. 2002), in which we held that the defendant was not prejudiced by evidence that another person might have committed the crime. We disagree. In Carroll, the physical evidence against the defendant was much stronger than here. "[B]lood was found on [the defendant's] sweatshirt and genitalia, and semen, saliva, and pubic hair recovered from the victim were consistent with that of [the defendant]." Id. at 620. Moreover, hair and blood samples taken from the other suspect "ruled out his involvement." Id. In this case, the physical evidence against the defendant is not as strong. Moreover, there is no evidence that rules out the involvement of the two white men whom an eyewitness saw at the victim's house around the time of the murder.
This case is more closely analogous to Rogers v. State, 782 So.2d 373 (Fla.2001), in which we concluded that a defendant was prejudiced by the suppression of favorable evidence because that "evidence could have been used to show that another person" committed the crime, and also "could have been used to directly impeach [the] testimony" of a witness upon whom "the States case for conviction was substantially predicated." Id. at 383. The suppressed evidence in this case could have been used to make essentially the same two points to the jury: first, that two unidentified men were acting suspiciously at the place and time of the crime, and second, that the testimony of the defendants cellmate regarding the defendants alleged confession was unworthy of reliance.[11]
*788 We conclude that our confidence in the defendant's murder conviction has clearly been shaken by the evidence that the State suppressed in this case. While there is not a "smoking gun" in the suppressed evidence that would completely exonerate the defendant, there was also not a "smoking gun" in the State's case against him. Just as irrefutable evidence of guilt is not required for a conviction, irrefutable evidence of innocence is not required for a conviction to be set aside under Brady. The United States Supreme Court has explained that suppressed evidence must be examined "collectively, not item by item," to determine whether it prejudiced the defendant. Kyles v. Whitley, 514 U.S. at 436, 115 S.Ct. 1555.
Based on the above analysis, we conclude that the defendant's trial did not result in a verdict worthy of confidence.

CONCLUSION
In conclusion, because we find that the State's failure to provide the defense the interviews of witness Tina Glenn and other exculpatory evidence severely compromised Floyd's constitutional right to a fair trial, we hold that a new trial is warranted. Accordingly, we reverse the trial court's denial of Floyd's motion for postconviction relief and remand to the trial court with directions that his conviction be set aside and a new trial be conducted.
It is so ordered.
PARIENTE, C.J., and ANSTEAD and CANTERO, JJ., concur.
LEWIS, J., concurs in result only.
WELLS and BELL, JJ., dissent.
QUINCE, J., recused.
NOTES
[1] Floyd alleged that the State withheld (1) the victim's neighbor's statement that she saw two white men enter the victim's house around the time the victim had died; (2) evidence that Huie Byrd, the man who accompanied Floyd when he was arrested, provided deceptive responses on his polygraph; and (3) evidence which would have been used to impeach Gregory Anderson, one of Floyd's former cellmates, who testified that Floyd confessed to the crime. See Floyd v. State, 808 So.2d 175, 183 n. 16 (Fla.2002).
[2] Floyd asserted that trial counsel was ineffective for failing to adequately investigate and present mitigating evidence during the penalty phase at resentencing and provided ineffective assistance during voir dire at the same resentencing. In addition, Floyd asserted that his original trial counsel rendered ineffective assistance during the guilt phase. See Floyd v. State, 808 So.2d 175, 182 nn. 13-14 (Fla.2002).
[3] Two police reports were introduced to establish Tina Glenn's statements to the police. The first report reflects:

Conducting neighborhood investigation, this investigator started at the victims residence viewing the exterior of the residence, finding that it had been recently painted with paint being found splattered on the bushes around the residence.
This investigator had in mind the current investigations on an individual named Richard Nigger [sic] being a white male, 18 years old, who is under current investigation for bilking money from elderly white females in that general area in contracting to paint their residence.
First party contacted in the neighborhood by this investigator was Tina Glenn at 1310 13th Street North, no phone, who advised that she was aware of the homicide investigation and indicated that on Monday at 1100 hours she last saw the victim around the residence wearing a dress described as possibly being aqua with flowers and the victim was on the southside of the residence bent over looking at something on the ground. The victim picked up something from the ground and then went back into the house.
She indicated that somewheres in the neighborhood at 1330 to 1400 hours while watching "All My Children" on television, she heard a car pull up and observed it facing south between her house and the victims house in front of a large hedge of bushes. She advised the vehicle was possibly a Lincoln Continental white over redish orange being in poor condition and having red primer on the large portion of the vehicle advising the vehicle had a spare tire kit in the trunk similar to the continental kit. While discussing the description of the vehicle, this investigator noted a white over red Cadillac sitting across the street also having primer on it. At which time she advised the color was more orangish and advised the Cadillac was at that location when the Lincoln pulled up.
She described the suspect 1, being the passenger as a white male, 30 years old, tall thin, dark long hair with big curls, moustache indicating his eyes stood out in contrast to his skin having dark eyes and light color skin.
Subject was wearing possibly a faded out plaid shirt almost white in color with blue jeans.
Subject number 2, white male, approximately 30 about the same height however, medium build, having straight short brn hair, clean shaven wearing a t-shirt and blue jeans. She indicated both subjects had a fast stride up to the house, knocked on the door, and although she did not see the victim they were led into the house. She advised possibly a half hour to 45 minutes later, she heard the door slam at the house at which time again she peered out and observed both subjects running to the car looking around suspiciously and get into the car and speed off.
The second report states:
Second interview conducted on Tina Glenn, of 1013 13th St. No, was done at the police station on a voluntary basis which time reviewing the original info. Miss Glenn advises she was watching "All My Children" on the tv on 1/16/84, being Monday afternoon and believes it was sometime between 1300 and 1330 hours, however, she could not recall the exact time it came on. She advised that she heard a car pull up heard two car doors slam heard voices at which time she went to the window. She observed a Lincoln continental four door, white over redish orange with primer on the vehicle spotted around the entire body of the car, with dark windows, and what appeared to be dark vinyl upholstery with the seats containing headrests. Two white males walked fairly fast towards the front of the residence and one subject knocked on the door and both subjects walked into the residence, however, she did not see the victim actually answer the door.
Miss Glenn advised that she did her dishes gone out walked her dog, heard someone walking on the wood floor within the residence during that time and observed movement thru one of the south windows and also observed subject 1, come out onto the back porch area of the residence while Miss Glenn was on the northside of her residence under the carport with her dog.
Re-entering the house she put her daughter down which she always does around 1300 hours and advised the subjects were still at the residence.
She further indicated while she was standing with her dog out underneath the north awning, carport area of her residence, she advised the neighborhood was very quiet and she could hear a lot of things going on inside the residence of the victim describing them as "scrambling noises." Asking her to define her description she stated "like looking thru things." Further stating "like in the kitchen." Asking her to explain how she could hear noises of people looking thru things from inside the victims residence, she again just indicated it was very quiet while standing under the carport area and it sounded like people were going thru drawers and other things in the house.
She advised approximately a hour after the individuals had arrived, she heard the front door slam, (indicating the front door and the back door having different noises that she is familiar with, with the back door being louder then the front door).
She stated she went to the window again and looked out at which time she saw them "walking very fast" almost running and looking around very suspicious. She stated that she went to the front porch area and states that she heard the curly hair subject say to the driver, "come on lets go". She indicated the vehicle then had the tires squealing as they left and even things[thinks] they ran the stop sign at 13th Avenue heading southbound from the residence.
With the possibility that subject Richard Nigger [sic] had been working in that area, painting residences and known to be bilking elderly ladies of money previously constructed photo pack made up by Det. L. Davis, homicide robbery squad was shown to Miss Glenn, which contained Richard Nigger's [sic] photograph however, she did not identify Nigger [sic] but indicated subject 1, previously described was looking similar to photograph 95784.
The very large "buck type" knife being carried by Miss Glenn, was taken by this investigator to Technician Anderson and a chemical test was run for any traces of blood with negative results.
The knife being returned to Miss Glenn and she was subsequently transported back to her residence.
[4] At the postconviction hearing the defendant presented evidence of previously undisclosed police reports that conflicted with evidence presented by the State at trial. At trial, the State introduced evidence that Negroid hair fragments were found on the victim's bedspread and sheet, but Detective Engelke's police report states that her bed was fully made. Detective Engelke's report also noted that something appeared to have been moved from the room, but this never came out at trial. A statement in Detective Olsen's previously undisclosed report about non-fresh pry marks on the north window conflicts with Detective Engelke's report that the north window pry marks did appear fresh. This also conflicts with Detective Engelke's trial testimony that there were two windows with fresh pry marks. One of the undisclosed reports of the State contained information that the victim's house had been painted in either fall or winter of 1983. If trial counsel had known of this, he could have used this to challenge the State's case. Also included in these reports were sworn statements of Edna Whitfield and Gregory Anderson. Whitfield stated that she thought that Huie Byrd may have killed the victim. Further, the reports noted that Byrd had shown deception on a polygraph examination.

The State also previously failed to disclose letters written by the jailhouse informant, Gregory Anderson, to a detective and an assistant state attorney offering cooperation and seeking a deal. The defendant also claims the State failed to correct false or misleading testimony of Gregory Anderson. At trial, Anderson testified that he did not know if he would receive any consideration for his testimony. However, the State did not disclose a letter that Anderson wrote to the prosecutor in which he memorialized conversations about a deal in his case. Anderson also stated under oath that law enforcement officers engaged in negotiations with him about reducing his case. In closing arguments at trial, the State represented that Anderson had not been offered any deals.
[5] See Miller v. State, 360 So.2d 46, 47 (Fla. 2d DCA 1978) (requiring the production of statements made by police officers who witnessed a crime and wrote their observations in police reports despite the holding of a previous case "that police reports are not public documents open to inspection").
[6] The proper test for prejudice is not whether the suppressed evidence "would have resulted ultimately in an acquittal." Kyles, 514 U.S. at 434, 115 S.Ct. 1555. That would be too high a bar. In fact, as we have explained, the test is not even whether the evidence "more likely than not" would have resulted in an acquittal. Young, 739 So.2d at 557 (quoting Kyles, 514 U.S. at 434, 115 S.Ct. 1555). All we have required is a "reasonable probability that had the information been disclosed to the defendant, the result of the proceeding would have been different." Id. at 559 (emphasis added). In other words, the test in Brady focuses on the fairness and reliability of a trial that took place without access to the suppressed exculpatory evidence, rather than requiring a showing that the actual result would have been different as is required when a new trial is sought based on newly discovered evidence. The rationale for the less restrictive standard is acknowledgement of the government's misconduct in withholding evidence and the effect that misconduct has on a defendant's right to due process and a fair trial.
[7] See, e.g., Thomas v. Kuhlman, 255 F.Supp.2d 99, 102 (E.D.N.Y.2003); Cox v. State, 555 So.2d 352, 352 (Fla.1989).
[8] See Roderick Seeman, Japanese Violate U.S. Antitrust Law, The Japan Lawletter (Jan. 1987), available at http://www. japanlaw.info/ lawletter/jan87 /fab.htm.
[9] Of course, there are also potential weaknesses in Glenn's story. For example, her claim that the two men were loudly rummaging through the victim's house is somewhat at odds with the observation (contained in another police report) that the "residence was not ransacked and appeared to be in its usual state" when the victim's body was discovered. Also, the reports from Glenn's interview leave the impression that the men ran out the front door of the house, which was locked from the inside when the police arrived to find the victim's body. One report states that Glenn "heard the front door slam ... indicating the front door and the back door have different noises," and then she "went to the window again and looked out at which time [she] saw them `walking very fast'" toward their car. The other report states that Glenn "heard the door slam at the house at which time again she peered out and observed both subjects running to the car looking around suspiciously." To the extent that these reports imply that the men left through the front door, it would appear that someone else may have entered the victim's house later in the day.
[10] The defendant also asserts that the State's Brady violation as to the neighbor's statements was aggravated by the State's failure to disclose other Brady material and by the testimony given in a discovery deposition of a police investigator, where it was stated that the victim's neighbors were contacted but no relevant information was discovered other than that a black male was seen in the neighborhood the day of the crime. The deposition statement, of course, is directly contrary to the evidence of the police interviews of the victim's neighbor, Tina Glenn.
[11] In addition to Young and Rogers, discussed above, we have reversed and remanded other cases for new trials in which arguably less material evidence was withheld from the defense. See Mordenti v. State, 894 So.2d 161 (Fla.2004) (new trial ordered because State failed to disclose a witness's date book, which could have been used by the defense for impeachment purposes, and crucial information obtained from the State's interview with a key witness); Cardona v. State, 826 So.2d 968, 971 (Fla.2002) (the withheld material warranting new trial was "three typed criminal investigation reports and a proffer letter from [the co-defendant]'s attorney to the State outlining the substance of what the [co-defendant] was prepared to testify to at Cardona's trial"); Hoffman v. State, 800 So.2d 174, 179-81 (Fla.2001) (nondisclosure of hair evidence and reports concerning the investigation of other suspects (including a confession) required a new trial); State v. Huggins, 788 So.2d 238, 243 (Fla.2001) (new trial required because the State suppressed witness statement that would have been favorable for the defense). All of these decisions support a conclusion that a substantial Brady violation was committed by the State in Floyd's case.