GREEN, J.
Andre Elton Adkins appeals his conviction and sentence for the second degree murder of his friend, Theron Gaskin, pursuant to a jury verdict. He raises two arguments on this appeal. First, he asserts that the trial court improperly denied his peremptory challenge to a Hispanic juror. He next maintains that the trial court improperly denied his motion for a new trial on the grounds that the State’s suppression of certain Brady[1] material, which could have impeached or undermined the credibility of the state’s sole eyewitness, prejudiced his right to a fair trial. We reverse based upon our conclusion that the second issue warrants a new trial; it is unnecessary for us to address the first issue.

BACKGROUND

The day of the incident began as a day of leisure activities for Adkins and two of his life-long close friends, Carl Glover, and Theron Gaskin, the victim.[2] By the day’s end, however, the men had been drinking heavily, an argument broke out, and Gas-kin was shot to death. Adkins would be charged as the shooter; Glover would serve as the State’s sole eyewitness. Because there was no independent physical evidence tying Adkins to the murder, the State’s case rested solely upon the testimony and credibility of Glover.
Prior to putting Glover on the stand, the State moved in limine to exclude evidence that Glover had been arrested. The State disclosed that nine months after the murder, Glover was arrested for throwing a deadly missile into a vehicle. The State argued that the arrest was not an appropriate topic for cross-examination because the incident was too remote (fourteen months before trial), and the case against Glover had been no-actioned.
The defense argued that evidence of the arrest should not be excluded because the case was no-actioned solely to protect Glover’s credibility in this murder case. Hence, the defendant was entitled to question Glover on cross-examination regarding this matter. The defense additionally noted that three months after the murder, Glover was the aggressor in an aggravated assault complaint involving a gun matching the same description as the weapon used to kill Gaskin. These incidents, the defense argued, would be relevant to impeach the credibility of the State’s sole eyewitness — the only source of evidence against Adkins. Moreover, the defense urged that Glover’s subsequent use of a weapon similar to the one utilized in this case would tend to suggest that Glover, not Adkins, possessed the murder weapon.
The court decided to defer ruling on these matters until after Glover’s direct testimony. Thereafter, the court announced that the defense could question Glover outside of the jury’s presence about these two incidents. The court would then *739 determine whether they could be introduced on cross-examination.

TRIAL EVIDENCE

State’s Case

Glover took the stand and acknowledged that he was a convicted felon.[3] He testified that he had known Adkins for twenty years and the victim, Gaskin, for 15 years. On the day in question, the three men ran errands together in the morning. They picked up Adkins’ co-worker, Roy, and went shopping at the flea market. Later, the group bought some gin and drove to a pool hall.
Roy, Glover, and Gaskin went into the pool hall. Adkins remained in the car talking on his cellular phone and drinking gin. Gaskin drank beer inside the pool hall. Glover testified that he would periodically return to the car to drink gin. Glover testified the he was “tipsy,” but not drunk. He testified, however, that Gaskin drank too much beer, became drunk, and started acting a “little crazy.” The pool hall owner came over and told the men to quiet down. Glover went out to the car and warned Adkins that Gaskin “look[ed] like trouble.”
Gaskin then emerged from the pool hall. He was angry and arguing with Glover. At that time, Glover’s brother drove up. Glover told Gaskin to get in Adkin’s car; Glover drove away with his brother. They went to a gas station; Adkins and Gaskin met up with them there. Roy remained at the pool hall.
Glover testified that Gaskin was very drunk at the gas station. Gaskin vomited and tripped over himself. Glover also testified that there was a white, Hispanic girl at the gas station who was there to meet Adkins. Everyone remained at the gas station for twenty to thirty minutes. Glover testified that he calmed Gaskin down and told him he wasn’t mad at him. Glover took Gaskin back to Adkins’ car. Gas-kin passed out in Adkins’ car. Glover’s brother left, and Glover got in the car with Adkins and Gaskin. The three men drove away to take Gaskin home. The woman Glover described as Hispanic followed them in her own car.
Gaskin awakened on the ride home and was very upset with Adkins about something. When they arrived at Gaskin’s home, Gaskin became angry at Glover. Gaskin took off his shirt and challenged Glover to a fight. Glover testified that he refused.
Glover testified that Gaskin went over to Adkins who was sitting in the car. Adkins got out of the car. Gaskin pushed Adkins and slapped his face. According to Glover, Adkins then took out a chrome .45 caliber pistol and shot Gaskin. According to Glover, Adkins kept firing in quick succession as Gaskin put up his hands in a defensive posture. Gaskin turned and fled and Adkins chased him and continued shooting Gaskin in the back.
Gaskin died from a bullet wound to the back. He also sustained four other nonlethal bullet wounds. The police found five .45 caliber casings, fired from the same semi-automatic pistol, on the sidewalk in front of Gaskin’s house.
Glover testified that he ran from the scene of the shooting to Adkins’ home down the street because someone was also shooting at him. However, no physical evidence, such as ejected shells, was recovered to corroborate this testimony. When Glover arrived at Adkins’ home, Glover told Adkins’ brother, McMullen, what had transpired. Glover and McMullen then drove away together. While the two of *740 them were together, Adkins called Glover’s cellular phone. Glover handed the phone to McMullen who spoke to Adkins. Glover and McMullen drove to a girl’s house[4] where they found Adkins.
According to Glover, they found Adkins covered in blood with the .45 caliber pistol still in his hand. Adkins was crying and asking why the victim had to slap him. Adkins took off his clothes and showered. After his shower, Adkins joined Glover and started asking what he should do next. At that point, a decision was made to get rid of the murder weapon. Glover, McMullen, and Adkins drove to a canal. When they reached the canal, Glover testified that McMullen was ill and Adkins did not want to look at the gun; Glover tossed the gun into the canal. Glover then got back into the car and drove home.
The next day, Glover spoke to Adkins. According to Glover, Adkins stated that he “didn’t know what came over him.” He could not explain why he had killed his friend. Glover later told his wife and parents what had happened and then told Adkins that he was going to report the matter to the police. Glover gave two statements to the police — the first statement described the events which lead to the shooting; the second statement concerned events after the shooting, including his disposal of the murder weapon. The State then tendered Glover for cross-examination.
Prior to cross-examination, the trial court revisited the State’s pre-trial motion in limine to exclude evidence of Glover’s arrest for throwing a deadly missile and evidence of an incident involving an aggravated assault, both of which occurred after the murder and prior to the trial. The trial court permitted the defense to voir dire Glover outside of the presence of the jury about these incidents.
Glover admitted that he had been arrested in April 2003 for throwing a deadly missile but he did not remember being arrested on October 30, 2002, for the aggravated assault. He also confirmed that he had recently been arrested for driving with a suspended license but that the case had been dismissed.
The trial court found the April 2003 arrest for throwing a deadly missile was too remote in time to form a basis for a bias and granted the state’s motion in li-mine as to the arrest. As to the October 2002 incident involving the aggravated assault, the trial judge concluded that there was nothing of record to indicate that Glover had ever been arrested for this charge. The court, therefore, granted the state’s motion in limine as to this incident as well.
During cross-examination of Glover, defense counsel drew out the myriad of inconsistencies between Glover’s deposition testimony, his statements to police, and his trial testimony. The defense’s theory was that Glover had committed the murder. The defense particularly highlighted the inconsistencies in Glover’s description of the woman who had met Adkins at the gas station. Glover described her as Hispanic at some points, then as white. Her testimony for the defense would reveal that she was African-American.
Additionally, the defense drew out prior inconsistent statements Glover gave about how he disposed of the .45 caliber gun. Originally Glover told the police that Adkins had thrown the gun in a canal. He admitted lying about this to the police, and that he had thrown the gun in the canal. *741 Although the police dragged the canal twice, no gun was ever recovered.
Ms. Millicent Dove then testified for the State. She lived on the street where the murder took place. She testified that after hearing “one shot,” she looked outside and saw an unidentified man running from Gaskin’s yard to the house “across from” hers.
Cameron Williams, another neighbor, testified that after hearing many gunshots, he walked outside and saw a white Millenia traveling away from Gaskin’s house. Although he knew both Adkins and the victim, he could not identify Adkins as the driver.
Detective Burke, a uniformed patrol officer, testified that he was dispatched to the scene of the murder. He found the victim conscious, laying on the porch of a house. The victim appeared to have been shot numerous times. Detective Burke secured the crime scene, but did not retrieve any evidence.
Criminal technologist Gilbert processed the crime scene and collected blood samples, five expended .45 caliber casings, and some bloody clothing. The casings were submitted for analysis.
A firearms examiner, Hurtell, testified next. He examined the five .45 caliber casings found at the scene. All five casings were fired from the same semiautomatic pistol.
The state’s next witness was Gonzalez, a latent fingerprint examiner. She evaluated the five casings for fingerprints. Her results, however, were negative for latent fingerprints of comparison value.
Detective Fletcher testified that she went to the Ryder Trauma Center to photograph the victim and test for gunshot residue. The victim had gunshot wounds to his upper right arm, right side, right chest under the nipple, the back of the hand and index finder, and back.
Dr. Motte, an Associate Medical Examiner, performed the autopsy on the victim. He testified that the victim had six gunshot wounds. The victim’s wounds were consistent with the victim running and the cause of death was a gunshot wound to the chest.

Defense’s Case

The defense called two witnesses. The first, Jackson Kouamin, lived across the street from the victim. According to Kouamin, he was home on the night of the murder when he heard gunshots. He turned on his front lights, opened the door and saw the victim running towards his house. The victim was bleeding. Koua-min also saw the shadow of a person who disappeared when Kouamin began to yell. That “shadowy” person ran northbound. Kouamin could not identify the “shadowy” person -he saw running and he testified that the person could have been anyone.
The victim was hysterical; Kouamin attempted to calm him down. Kouamin asked who had shot him. The victim stated that “one of his home boys shot him.” Kouamin asked the victim which one shot him, but the victim could not say. The victim was hysterical and attempting to get inside of the front door. Kouamin called the police while holding the victim.
The defense also called Keisha Cauley, Adkins’ friend, to testify. She testified that on the night of the murder, Adkins called her and asked her to meet him at the pool hall where he, Glover, Roy, and the victim were playing. By the time that she was ready to leave for the pool hall, however, Adkins told her to meet him at the gas station instead.[5] She testified that Adkins *742 arrived at the gas station with some other men. He directed her to follow him to a house nearby where he was dropping off one of his friends.
Ms. Cauley followed Adkins to a residential neighborhood. When Adkins’ car stopped, she put her car in park behind it, but left it running. Adkins walked from his car to Ms. Cauley’s car and stood at the driver’s window. The two discussed their plans for the evening. While they talked, gunshots rang out. Ms. Cauley immediately drove away in fear. She did not see who fired the gun, but testified it could not have been Adkins because he was standing right next to her at the time. She could not say where Adkins was after she drove off or what he did. She finally testified that she did not see a White Hispanic female at the scene and that she, an African American, was the only woman there.
On cross-examination, Ms. Cauley acknowledged that she doesn’t have good vision and wasn’t wearing her glasses that night. She also acknowledged that she never telephoned the police about the shooting after she left the scene. Nor did she come forward with her story after she learned that Adkins had been charged with the crime. After the shooting, Ms. Cauley visited Adkins more than 20 times and spoke with him by phone numerous times.
After this testimony, the defense rested. The state put on a brief rebuttal witness, then rested.
The jury found Adkins guilty of second degree murder. The trial court sentenced him to life in prison with a twenty-five year minimum mandatory for discharge of a firearm.

MOTION FOR NEW TRIAL

After trial, defense counsel moved for a new trial based on, among other things, newly discovered evidence that Glover had been the subject of twelve separate criminal complaints to the police involving violent acts during the year after the murder in this case.[6] All the offenses took place in the same neighborhood as the murder, were reported to the same police station that investigated the murder, and involved violent acts. The police cleared Glover of all the charges, in most cases within the same day that they were reported. Glover was only arrested on one of the charges, the no-actioned deadly missile case which was the subject matter of the State’s pretrial motion in limine. Two of the incidents, occurring three and four months after the murder involved a chrome .45 firearm, matching the description of the weapon used in Gaskin’s murder — the weapon Glover testified that he threw into the canal after the murder, and that he never possessed.
The murder in this case took place June 15, 2002. The defense introduced an incident log that in the year that followed, Glover was the aggressor in the following incidents reported to the police:
1. September 24, 2002 — Aggravated Assault — Glover, while driving his car, fired a bullet from a chrome .45 into a car driven by a Kevin Bain.[7] Police investigated; two persons heard the gunshot. Glover told police that his friend could clear him. The friend was never located. *743 On November 15, 2002, police detective was informed by an Assistant State Attorney that due to lack of independent witnesses, no charges would be filed against Glover.
2. October 30, 2002 — Aggravated Assault — Glover drove up to Kevin Bain and threatened to shoot him, and lifted his shirt to reveal to Kevin a chrome gun. Kevin’s brother, Jeffrey, who was with him, heard the threat, but ducked as Glover reached under his shirt for a gun. Police investigator closes the case on November 20, 2002.
3. November 21, 2002 — Simple Battery — Glover walked up to Jeffrey Bain, verbally threatened him, struck him and grabbed him. Kevin Bain witnesses incident. Glover was “exceptionally cleared” the same day.[8]
4. November 27, 2002 — Throwing Deadly Missile — While Kevin Bain was driving, Glover threw two rocks at the car. The case was closed on January 2003.
5. November 27, 2002 — Glover verbally threatens Cleveland Bain. Glover was “exceptionally cleared” the same day.
6. December 25, 2002 — Assault—Glover threatened to kill Kevin Bain that evening. Bain declined to press charges. The case was closed January 4, 2003.
7. March 28, 2003 — Throwing Deadly Missile — Violation of Injunction — Glover threw a rock and bottle at Kevin Bain’s car, breaking the window and cutting Bain’s arm. Glover was arrested on April 24, the State no-actioned the case on May 15, 2003 for insufficient evidence to proceed. The victim failed to appear.
8. April 22, 2003 — Battery—Glover struck Akilah Martin, his child’s mother, in the face and throws her to the ground. Glover was “exceptionally cleared” the same day.
9. July 8, 2003 — verbal threat — Glover threatened to kill Kevin and Linda Bain that night. Glover was “exceptionally cleared” the same day.
10. July 13, 2003 — verbal dispute — Glover engages in a verbal dispute with Kevin Bain., Glover was “exceptionally cleared” the same day.
11. August 12, 2003 — Simple Battery— Glover pushes Akilah Martin to the ground and chokes her. Glover was “exceptionally cleared” on August 22, due to conflicting statements.
12. September 8, 2003 — Simple Battery — Glover and his brother punch Akilah Martin, pull her out of her vehicle and punch and kick her causing bruises and abrasions. Glover was “exceptionally cleared” the same day.
The defense argued that the State had suppressed this evidence; that the evidence and disposition of all these cases was in Glover’s favor. The defense argued the evidence was relevant to establish Glover’s bias and motivation to testify favorably for the State in this case; that the evidence impeached Glover’s credibility, particularly as he claimed that he disposed of the murder weapon; and that Glover, who possessed the weapon and was the only other viable suspect in the murder, was the person who killed Gaskin. In response, the State conceded it did not reveal this evidence, but asserted that it was not admissible to show bias or motive. Moreover, it argued that these incidents were too remote or dissimilar from the murder case to be admissible to impeach Glover’s credibility, or to show Glover was the perpetrator in this case. The trial court agreed with the State and concluded that the incidents were too remote in time *744 from the trial to be admissible. This appeal followed.

ANALYSIS

We agree with the Appellant that his motion for a new trial should have been granted based upon the State’s failure to disclose fully these criminal incidents accusing Glover, the chief and sole eyewitness in this ease, and the resulting dispositions in his favor by the police and/or the State. In a close cáse such as this, where the outcome depended solely upon the credibility of this eyewitness, we hold that the defense should have been permitted to question this witness about these incidents during cross-examination and that the cumulative effect of this newly discovered evidence was sufficient to create a reasonable probability that disclosure would have produced a different result at trial. Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).
When the prosecution withholds evidence favorable to the accused, and the evidence is material either to guilt or to punishment, the accused’s due process rights are violated. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Florida Supreme Court, applying Brady, has held that in order to establish a Brady violation, a defendant has to prove: “[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued.” Floyd v. State, 902 So.2d 775, 779 (Fla.2005) (citing Carroll v. State, 815 So.2d 601, 619 (Fla.2002)); Cardona v. State, 826 So.2d 968, 973 (Fla.2002)(citing Way v. State, 760 So.2d 903, 910 (Fla.2000)).
Addressing the first inquiry, we find that the evidence was favorable to the Appellant and, contrary to the trial court’s conclusion, it was not so remote in time to remove the motivation for the witness to want to curry favor with the State. Evidence is deemed favorable to the accused “if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The undisclosed evidence would have seriously undermined Glover’s credibility. See Floyd, 902 So.2d at 786. The myriad of criminal complaints lodged against Glover, some of which involved a weapon similar to the one used in this case, are clearly favorable to the appellant for impeachment purposes. Glover was the only witness who testified against Adkins. There was absolutely no physical evidence linking Adkins to the shooting. The only other person who could have committed the shooting was Glover. This evidence would have made it more difficult for the jury to rely on Glover’s testimony. We cannot help but conclude that had the jury been apprised of these other criminal incidents, Glover’s credibility would have been seriously undermined, casting doubt on our confidence in this verdict.
Moreover, the defense had an absolute right to cross-examine Glover on these threatened or potential criminal charges resolved in his favor so that the jury would be fully apprised as to his possible motive or self-interest with respect to the testimony he gave. See Morrell v. State, 297 So.2d 579, 580 (Fla. 1st DCA 1974).
The constitutional right to confront one’s accuser is meaningless if a person charged with wrongdoing is not afforded the opportunity to make a record from which he could argue to the jury that the evidence against him comes from witnesses whose credibility is suspect because they themselves may be subjected to criminal charges if they fail to cooperate with the authorities.
*745 Id. (citing Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)).
As to the second prong, there is no question that this evidence was suppressed by the State, whether inadvertently or willfully. Although the State asserts that the prosecutor was unaware of some of the police reports against Glover, the State concedes that the police is an agent of the State and therefore any knowledge attributable to the police must also be attributable to the State. Floyd v. State, 902 So.2d 775, 778 (Fla.2005) (Brady applies also to evidence “known only to police and not to prosecutor.”); Henderson v. State, 745 So.2d 319 (Fla.1999); Jones v. State, 709 So.2d 512 (Fla.1998); Gorham v. State, 597 So.2d 782 (Fla.1992); see State v. Coney, 294 So.2d 82 (Fla.1973)(state responsible for documents in its actual or constructive possession).[9]
Finally, as to the third prong of Brady, we find that the defense was prejudiced in this case because the suppressed evidence was material to the credibility of the State’s sole eyewitness to the crime.
As the defendant suggests, the jury could also have questioned the extent of police’s efforts in investigating the charges against the defendant. Additionally, the jury would also have seriously questioned Glover’s motivation for testifying as he did in view of the many complaints against him that have been no-actioned, particularly those involving a similar weapon and those in violation of a valid restraining order and against his child’s mother. Thus, given the fact that the defendant was not allowed the opportunity to cross-examine either Glover’s motivation for his testimony or law enforcement’s possible bias, the jury was presented with an incomplete picture that undermines confidence in the jury’s verdict. Any other conclusion is illogical.
The Supreme Court, in Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), reasoned that the phrase “reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,” in Bagley, was not so narrow as to mean “that the suppressed evidence would have resulted ultimately in the defendant’s acquittal. ...” 514 U.S. at 434-35, 115 S.Ct. 1555. Rather, the Court stated, the defendant need only show that the evidence “could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.” 514 U.S. at 435, 115 S.Ct. 1555; Strickler v. Greene, 527 U.S. 263, 290, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); Riechmann v. State, 32 Fla. L. Weekly S135, S137, — So.2d -, 2007 WL 1074938 (Fla. Apr. 12, 2007)(evidence would have put whole case in different light undermining confidence in verdict); Young v. State, 739 So.2d 553 (Fla.1999).
In view of the fact that Glover was the only eyewitness against the defendant, and there was no other evidence linking defendant to the crime, non-disclosure of this evidence certainly undermines our confidence in the verdict. We, therefore, reverse the defendant’s conviction and remand for a new trial.
This disposition makes it unnecessary to reach the remaining issue on appeal.
Reversed and remanded for a new trial.

. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

. In fact, Adkins’ mother is Glover’s godmother.

. Adkins has no prior convictions. He did not testify.

. The girl was not the white Hispanic girl who Glover testified was with Adkins at the gas station.

. She testified that Adkins stated that the victim was inebriated and making trouble at the *742 pool hall.

. An incident log was introduced into evidence demonstrating 22 incidents of complaints against Glover, 12 of which were assaults.

. The police reports reveal that there was a long-standing valid restraining order prohibiting Glover from going near Bain.

. Neither party to this appeal could explain to the court what this means.

. There is no question in this case that these uncharged criminal incidents were not equally accessible to the defense. See Provenzano v. State, 616 So.2d 428, 430 (Fla.1993)(with regards to Brady's second prong, there is no violation where the information is equally accessible to both the defense and prosecution, or where the defense actually has the information).